THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee v. LENN D. REED, Defendant-Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GLENN W. REED, JR., Defendant-Appellant.

Fifth District   Nos. 5—98—0777, 5—98—0778

Opinion filed September 7, 2001.—Rehearing denied October 1, 2001.

Daniel D. Yuhas and Lawrence J. Essig, both of State Appellate Defender's Office, of Springfield, for appellant Glenn W. Reed, Jr.

Daniel M. Kirwan and Lawrence J. O'Neill, both of State Appellate Defender's Office, of Mt. Vernon, for appellant Lenn D. Reed.

William Haine, State's Attorney, of Edwardsville (Norbert J. Goetten, Stephen E. Norris, and Trent M. Marshall, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KUEHN delivered the opinion of the court:

Lenn and Glenn are twin brothers. Their car-hijacking escapades spelled double trouble for drivers in and around Alton, Illinois. They have a cousin named Heather Weeden. She provided the bait for their unwary hijacking targets. She would lure drivers with romantic promise, board their vehicles, and direct them to a designated rendevous with the brothers Reed. Drivers eager to sample the wares that Heather strutted were always gravely disappointed when the encounter they expected materialized into a look down the barrel of a pistol. In the case of a young man named Michael Ufert, the encounter proved grave indeed. His car was not the only thing that was taken from him.

Lenn, Glenn, and Heather were friends with a young man named Andre Cunningham. As youths growing up in Alton, Illinois, they participated in youth programs, performing various song-and-dance routines in competition with other youngsters. Unfortunately, as they grew into their teens, they engaged in less wholesome activities. On September 1, 1994, at the age of 17, the four teamed up, intent on hijacking a 1993 Ford Mustang driven by Michael Ufert. They took his car after they took his life.

The discovery of Ufert's body in a remote area, followed by the

discovery of his wrecked car miles away, made the Reeds early suspects in the investigation. However, there was no evidence to link them to the crime. Suspicion lingered for several years due to their known penchant for vehicular hijacks. Then in 1996, an anonymous tip pointed investigators the way to Heather Weeden. Heather confessed, implicated the others, and assisted in the investigation. Self-schooled in the art of deception, she wore a wire and engaged Lenn in a 90-minute conversation designed to prompt unwitting admissions from her trusting cousin. The police videotaped the conversation, but the tape's sound proved largely inaudible. The only discernible comment of value was a declaration by Lenn: "[T]he police don't have anything."

Heather no doubt tasted the same feeling of dashed expectations experienced by her hijack victims. The State did not treat her assistance with the kind of favor that she had anticipated. She had to be gravely disappointed when the treatment that she expected for her assistance materialized into a devout pursuit of first-degree murder and aggravated vehicular-hijacking charges. Although the record is unclear as to whether she went to trial or pled guilty, we do know that she currently serves a 40-year prison term for her role in the murder and a 30-year prison term for her participation in the hijacking.

Heather did not appear at the trial of these two defendants. She did not testify. Nor was information that she had provided earlier a part of these proceedings. However, her confession proved to be invaluable, for it provided the tool by which the prosecution procured the testimony of Andre Cunningham. His testimony was the centerpiece of the State's case. There was no version of events to present to the jury without his claim of what happened. The jury could not harbor a doubt about his veracity and still convict these two defendants.

This is what Andre told the jury about the evening of September 1, 1994.

Heather wanted money. She spotted a nice target in Michael Ufert and his red 1993 Mustang GT. She pointed him out to the Reed twins, and their standard car-hijacking game was afoot. Andre admitted that he was a willing participant in the hijacking scheme.

Andre and the Reed brothers watched from afar as Heather solicited Ufert and boarded his car. As Heather and Ufert drove off, Heather's trio of cohorts followed. Lenn and Glenn became concerned when Ufert's car did not travel a path to where Heather had steered their other victims. The planned encounter usually occurred at Rock Springs Park in Alton, but Ufert's Mustang traversed the countryside, far beyond the Alton city limits. At times, it became difficult to maintain the car in their sight.

Andre remembered that rap music accented the ride, Lenn having dialed in the "108 Magic" radio station.

The Mustang finally came to a stop on an isolated country road adjacent to a field. Lenn pulled up a short distance behind, and he, Glenn, and Andre went to claim the object of their enterprise. Ufert exited his car, mindful of his predicament. When he did, Lenn stepped up and struck him in the face with a pistol. The gun discharged. A frightened Ufert tried to escape, bolting into the darkness of the nearby field. Andre explained how he and Glenn chased after Ufert and arrested his flight. As they held Ufert captive, Lenn and Heather approached them. Ufert was on his knees as Lenn drew near, gun in hand. Ufert pleaded with Lenn to spare his life, telling him and his other captors that he had a son to raise. In the midst of Ufert's supplicant pleas, Lenn shot him in the face and passed the gun to his twin brother with instruction to shoot again. Glenn readily complied, firing a shot directly into Ufert's chest. It proved to be the fatal wound. Glenn handed the gun to Andre. Andre claimed that he resisted firing another shot. However, Lenn, who decided that they were all going to shoot Ufert to seal their complicity and to assure future loyalty to one another, told Andre that his choice was to shoot Ufert or to share in his fate. Andre fired a third bullet into Ufert's body and walked back to the car. He heard the report of another shot as he left.

Andre rode back to Alton as a backseat passenger in Ufert's car. He was dropped off with advice from the Reed brothers. He was told that silence was the key to avoid sanction for what they had done.

The jury heard the foregoing facts from Andre Cunningham. Several facts that developed during the course of the investigation fit his description of what happened. They corroborated his presence when Michael Ufert met his death.

Authorities found Ufert's car the day after the killing, wrecked and abandoned. The radio was tuned to "Magic 108." Ufert's wife testified that he never listened to that radio station.

The circumstances under which the State procured the testimony of Andre Cunningham were a significant part of the trial. It took more than two years to break the case. Someone contacted the police and informed them that Heather Weeden had detailed knowledge about a murder. The details fit the circumstances of the Ufert homicide. Heather was confronted and confessed the details of the car-hijacking operation and the Ufert murder. The State intended to use Heather as a witness against these defendants. Apparently, she and the State could not agree on the terms under which she would provide that help. Heather must have balked at the concessions that the State was willing to make in order to have her testimony.

The State contacted an attorney who represented Andre Cunningham. At the time, Andre was incarcerated in the Madison County jail. He had already pled guilty to shooting someone in the back. He was awaiting trial on another aggravated-battery-with-a-firearm charge. The pending charge alleged that he shot someone else in the stomach. Andre had a demonstrated penchant for gunplay.

Initially, Andre resisted the State's overtures, thinking that the State could not prove his involvement in the Ufert murder. After his attorney provided him with a copy of Heather's statement, Andre decided to reconsider his position. He decided to testify against his bygone friends. It was a decision made easy by the carrot that the State dangled. It promised to forego any prosecution for murder, accept his plea to vehicular hijacking, and recommend a prison term no greater than 20 years.

The jury was thoroughly apprised of the fact that Andre's testimony was procured by way of these concessions. Thus, the jury had the benefit of weighing his testimony's worth against the terms of its purchase. The jury knew that Andre's testimony allowed him to get away with murder. However, the terms of his arrangement with the State still presented the possibility of 20 years of imprisonment. There was a strong implication, argued by the prosecutor, that even though he signed on as the State's key witness, Andre would spend the better part of the next 20 years in prison.

The actual plea bargaining and sentencing were postponed until after Andre testified against his cohorts. Andre testified on June 10, 1998. On June 17, 1998, he pled guilty to armed robbery rather than vehicular hijacking. On November 16, 1998, an order was entered sentencing him to time served on that armed robbery. The sentencing judge ordered his immediate release at that time, and the punishment for his role in Michael Ufert's death was complete.

Andre received other favorable treatment from the State. He claimed that it was unrelated to his agreed-upon testimony, an assertion that his attorney and the State seconded. However, the defense suggested that the State's sponsorship of favorable treatment on the two pending charges of aggravated battery with a firearm was an added benefit in return for testimony, value that the jury needed to weigh in assessing Andre's interest in being a witness for the State.

Andre officially signed on as a State witness on October 24, 1996. Two days later, a pending charge of aggravated battery with a firearm was dismissed by the State. Andre had previously received the minimum six-year prison sentence for aggravated battery with a firearm. In order to skirt truth-in-sentencing requirements, the sentencing judge found that shooting someone in the back did not produce bodily

harm. Apparently, the Illinois Department of Corrections took a different view. On March 2, 1998, the sentencing judge had to order the Department of Corrections to credit Andre with day-for-day good-time credit on his six-year sentence.

The jury listened to Andre detail the circumstances of Ufert's murder. As the State elicited the events that led to his becoming a State witness, defense counsel objected, claiming that the State was fashioning the circumstances in a way that made Andre appear to be a "good guy." The prosecutor then offered his opinion that Andre was a "good guy."

After Andre testified, the State called an attorney named Harry Anderson to the stand. Anderson represented Andre. He recalled that in October 1996, he was summoned to the Madison County State's Attorney's office by the prosecutor in charge of this murder investigation. He was told that Andre was a murder suspect but that in return for Andre's assistance against the other suspects, the State was willing to forego murder charges.

He left his meeting with the assistant State's Attorney and visited Andre. He asked Andre about the State's overture, and Andre responded, "Well, I'm sure they want to talk to me about a murder that happened awhile back." Anderson testified that Andre then confided in him. Before any deal with the State was in place, Anderson learned from Andre that Andre, along with Lenn, Glenn, and Heather, murdered Michael Ufert.

The jury found the defendants guilty. The findings of guilt for committing first-degree murder wrought a 75-year prison term for Lenn Reed and a 70-year prison term for Glenn Reed. The findings of guilt for committing aggravated vehicular hijacking drew 30-year prison sentences for both of them. The sentences were ordered to be served concurrently.

The defendants raise several issues on appeal.

First, they challenge the sufficiency of the evidence. They assert that their convictions rest entirely upon the uncorroborated testimony of an actively involved accomplice who testified with substantial self-interest. They argue that his word is a legally unacceptable basis for the convictions, particularly in light of his active role in the murder, coupled with the benefits that he obtained in return for his testimony. Hence, the defendants conclude that the State has failed to establish their guilt beyond a reasonable doubt.

We agree that these convictions rest upon the largely uncorroborated testimony of an accomplice witness. While there are numerous pieces of evidence that corroborate Andre Cunningham's knowledge about the murder and credit his presence at the scene of the crime,

there was little to corroborate his claim that the Reed brothers were also to blame. Notwithstanding, given our standard of review and our supreme court's view of how that standard applies to accomplice testimony, we cannot accept the conclusion that Andre's testimony, standing alone, cannot support a conviction.

●1 We review this issue under an oft-stated standard of review that prevents us from reweighing the evidence from our view of its worth. That standard requires us to ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Byron*, 164 Ill. 2d 279, 299, 647 N.E.2d 946, 956 (1995).

●2 We might question whether rational jurors using caution should ever credit testimony from the likes of an Andre Cunningham. We might further question whether someone who levels an accusation in exchange for absolution from a killing, someone who had a demonstrated penchant for shooting people, could ever be trusted to speak the truth. However, we cannot question the state of the law. Our supreme court has held that even when uncorroborated, "the testimony of an accomplice is sufficient to sustain a conviction if it satisfies the jury of the defendant's guilt beyond a reasonable doubt." *People v. Rivera*, 166 Ill. 2d 279, 287, 652 N.E.2d 307, 311 (1995), citing *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277 (1985).

We cannot say as a matter of law that Andre Cunningham's testimony was unworthy of belief. The jury saw it and chose to believe it, despite Andre's admitted role in the murder. Nor can we conclude that testimony procured with freedom precludes a jury from embracing such testimony, even though valid reasons exist to shun it.

●3 Determinations of the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence are responsibilities that befall jurors. *Byron*, 164 Ill. 2d at 299, 647 N.E.2d at 955-56. If believed, the testimony of Andre Cunningham was sufficient to establish guilt beyond a reasonable doubt. Aware of his many shortcomings, his interest in testifying favorably for the State, and their duty to assess his testimony with suspicion and caution, the jurors obviously believed in what he had to say.

Accordingly, we find that the evidence was legally sufficient to establish guilt beyond a reasonable doubt.

●4 The next issue arises out of the testimony of Harry Anderson. The defendants claim that the introduction of Andre's prior consistent statement, implicating the defendants in the murder and made in the confidence of the attorney-client relationship, resulted in reversible error. There is no question that the out-of-court statement was hearsay

and that it was damaging to these defendants. Nonetheless, it was admissible.

Defense counsel cross-examined Andre at length. He was confronted with prior inconsistent statements, with his past criminal conduct, with his admitted role in the murder, and with the personal gains in store in return for the story that he told. The pervasive theme of this examination was that Andre fabricated the blame cast to feather his own nest.

Once the defense implied a reason to testify falsely and suggested the manufacture of falsehoods to promote that reason, the State was permitted to show that Andre's claims were made before any motive to lie ever arose. See *People v. Williams*, 147 Ill. 2d 173, 227-28, 588 N.E.2d 983, 1003 (1991). Here, Andre told his attorney about the defendants' complicity in the Ufert murder, while he harbored the belief that the State's threat to prosecute was a bluff. He did not offer the information about the Reeds in pursuit of leniency. In fact, after confiding in his attorney, he told him that he was not interested in the State's invitation to deal.

Any motive to fabricate the defendants' involvement in the murder did not arise until the next day, when he contacted Anderson and asked him to find out what evidence the State had to prove his guilt. He had no reason to falsify the defendants' complicity in the murder until he was shown Heather's statement and realized that he might very well face a murder prosecution.

Andre's statement to Anderson, prior to the pursuit of any benefit in return for that statement, bore the ring of truth. Its admission was necessary and proper to rebut the notion, crafted by the defense during cross-examination, that Andre's testimony was a recent fabrication motivated by a desire to preserve his own self-interest.

A 90-minute videotape between a then-cooperating Heather Weeden and Lenn Reed was authenticated and admitted into evidence during the trial. While there was testimony elicited about the videotape, its contents, and how it was used during the course of the investigation, it was not shown to the jurors. The State explained its goal in arranging the taped surveillance and its failure to produce an audible conversation. The jury was told that Lenn could be heard to say, "[T]he police don't have anything." During the deliberations to verdict, the jurors wanted to view the videotape. The trial judge allowed them to do so.

The defendants claim that the trial judge erred in permitting the jury to watch the videotape. Their argument stems from the tape's inaudible condition. Due to the lack of discernible conversation, they argue that the event depicted was irrelevant and allowed the jury to

speculate that Lenn was discussing his complicity in the Ufert murder with Heather.

Defense counsel objected to allowing the jurors' request. However, they did not object to the admission of the videotape. Once admitted, publishing its contents to the jury was a matter that rested within the trial judge's discretion. See *People v. Gomez*, 236 Ill. App. 3d 283, 293, 603 N.E.2d 702, 707 (1992). Absent an abuse of discretion, we will not overturn a decision to allow the jury to examine admitted evidence. *Gomez*, 236 Ill. App. 3d at 293, 603 N.E.2d at 707.

●5 Contrary to the defendants' basic assertion, the contents of the tape were clearly relevant. " 'Evidence is relevant if it has "any tendency to make the existence of any material fact more probable or less probable than it would be without the evidence." ' " *People v. Anderson*, 237 Ill. App. 3d 621, 632, 604 N.E.2d 546, 553 (1992), quoting *People v. Mitchell*, 152 Ill. 2d 274, 332, 604 N.E.2d 877, 906 (1992), quoting *People v. Free*, 94 Ill. 2d 378, 425, 447 N.E.2d 218, 236 (1983). It simply cannot constitute an abuse of discretion for the trial judge to allow the jurors to see and hear admitted evidence that is relevant to their fact-finding task.

●6 The videotape, and the circumstances under which it was produced, corroborated the testimony of Andre Cunningham when he claimed that Heather Weeden was a participant in the Ufert murder. It was certainly relevant to the inquiry for the jury to see what Heather looked like. Andre claimed that her looks lured Michael Ufert to his death. It was also relevant for the jury to witness the kind of rapport that existed between Heather and another whom Andre accused, particularly when the known topic of conversation was the Ufert murder.

Testimony established that Heather was assisting the police and that she willingly engaged in the secretly taped conversation with her cousin. She, and the authorities, believed that she possessed the ability to generate open discussion about the Ufert murder. The jury was told that Heather's charge was to open a dialogue with Lenn about the murder. Given the stated purpose of the meeting, Lenn's comment that "the police don't have anything" was relevant. It was reasonable to infer from it, and the circumstances under which the conversation was arranged, that Lenn was mindful of the ongoing probe into the murder, was aware of what evidence had been developed, and had measured their chances of avoiding detection. Since the videotape was relevant to issues tending to establish the defendants' guilt, the jurors were entitled to see and hear the videotape.

●7 Next, the defendants claim that they were deprived of their right to a fair trial by the "gross misconduct" of the prosecuting at-

torney. First, they complain about the prosecutor giving the opening statement on his knees. The prosecutor, in argumentative fashion, went to his knees to assume the role of the victim, as he first described the moment of death to the jury. Second, the defendants decry the repeated questioning of two witnesses about seeing Lenn with a gun. The questions were designed to establish that Lenn possessed a gun, but without a direct link to the murder or its immediate time frame. The first time a witness was asked the question, the trial judge correctly sustained an objection on relevancy. The prosecutor continued to pose the same basic question by altering the time frame of the inquiry, but not linking it to the murder. The trial judge continued to sustain repeated objections to the entire line of questioning. Finally, the defendants find fault with the prosecutor's bolstering of Andre Cunningham's testimony by calling him a "good guy" during direct examination and an "honest man" twice in closing argument.

While prosecutors should refrain from argument in an opening statement, abide by the rules of evidence and a trial judge's ruling on the same, and avoid personal opinions about their witness's character traits, our examination of the record does not lead us to believe that the conduct complained of deprived either defendant of a fair trial. The trial judge shamed the prosecutor to his feet during the opening statement, instructed the jury to disregard the prosecutor's opinion that Andre was a "good guy," and sustained objections to the repeated inquiries about gun possession. With regard to Lenn's possession of a gun at some other time either before or after the murder, the only response given before an objection could be sustained was in the negative.

We note that only one issue that appellate counsel raised to challenge the fairness of these proceedings was properly preserved for appeal by trial counsel. We have addressed several of the issues without comment on that fact. If we thought that the various excesses of the prosecuting attorney amounted to "gross misconduct," we would again address the merits of this issue despite the question of waiver. However, we do not.

None of the conduct raised here was complained of in either defendant's posttrial motion. Hence, the error was not properly preserved for review on appeal, and the defendants have forfeited the right to complain. *People v. Enoch*, 122 Ill. 2d 176, 185-86, 522 N.E.2d 1124, 1129-30 (1988).

Next, the defendants argue that the trial judge should not have permitted the State to add an additional count of murder on the eve of trial and that trial counsel was incompetent by failing to seek its dismissal on speedy trial grounds. The added count of first-degree

murder involved the same facts known to the State since the inception of the prosecution. It pled felony murder, alleging that Michael Ufert's death occurred during the course of an aggravated vehicular hijacking, a circumstance known all along.

Had the jury returned a guilty verdict solely upon the added felony murder count or had the trial judge entered a judgment upon that guilty verdict, the defendants would have reason to complain. However, a judgment was not entered against either defendant on the added count of murder. Therefore, we have no reason to consider this argument, for the defendants are in need of no relief from the added charge. *People v. Majors*, 308 Ill. App. 3d 1021, 1030, 721 N.E.2d 753, 760 (1999).

●8 The defendants raise several arguments directed at the constitutionality of their sentences. First, they point out that fundamental fairness requires that similarly situated defendants may not receive grossly disparate sentences. *People v. Banks*, 241 Ill. App. 3d 966, 983, 609 N.E.2d 864, 876 (1993). Here, Lenn and Glenn Reed received a 75-year and a 70-year prison term, respectively, for the crime of first-degree murder, while Heather Weeden was sentenced to prison for only 40 years for the same crime. They argue that Heather, as well as Andre Cunningham, who escaped without any punishment for the murder, shared complete complicity in it yet received grossly disparate treatment in comparison to the punishment meted out to them. They point out that Heather and Andre performed all of the same criminal acts performed by them and that the crime was Heather's idea. They also note that when Ufert tried to flee to safety, it was Andre who chased him down and held him captive for the others.

At first blush, the divergent treatment of the four people responsible for Michael Ufert's death seems whimsical. However, upon closer examination, the disparate punishment is supported by valid reasons.

For the purpose of this analysis, we must accept as truth that version of the crime upon which the verdicts rest. An analysis of the facts set forth in Andre Cunningham's testimony reveals that the four participants in this murder are not similarly situated. The circumstances of the crime itself, coupled with events surrounding the prosecution, warranted different punishments.

Clearly, the decision to turn a car hijacking into a murder originated in the mind of Lenn Reed. He, and he alone, possessed the power to hear Michael Ufert's pleas and spare his life. He made the decision to kill. He, among those responsible for the death, was the most evil. His acts were the most despicable. Lenn not only made the

life-or-death decision but imposed that decision on the others, requiring their participation in the killing by threat to their own lives in lieu of active involvement. Glenn Reed was the second to shoot Michael Ufert. He did not have to hear any threat to his own safety, and none was made, before he accepted the gun and fired a bullet at point-blank range into Ufert's chest. He inflicted the unkindest wound, the one that ended Ufert's life. The other three wounds likely would not have proven fatal. He may well have taken less deadly aim, had he any reticence over committing murder. His willingness to participate in the killing and his intention when doing so were both clear. Ufert was already shot in the head. He aimed for another vital area of the body and was the participant that sealed Ufert's fate.

We think that the Reed twins shared a greater role in, and a greater responsibility for, this death. Moreover, neither one has ever done anything to demonstrate a sense of remorse or acceptance of responsibility.

Neither brother can be punished for denying guilt and exercising his right to stand trial. However, others who admit guilt and negotiate guilty pleas can be treated differently because of that fact.

Heather Weeden may well have pled guilty. A part of the record seems to suggest that she pled guilty to murder and vehicular hijacking in exchange for agreed-upon concurrent sentences. This might well serve as reason for her disparate treatment. To the extent that the record is unclear and the circumstances under which Heather was sentenced are unknown, the uncertainty falls upon the defendants, who have the burden to provide "a record from which a rational comparison of sentences can be made." *People v. Cooper*, 239 Ill. App. 3d 336, 363, 606 N.E.2d 705, 724 (1992); *People v. Generally*, 170 Ill. App. 3d 668, 676, 525 N.E.2d 106, 110 (1988).

There are other reasons that support the lighter sentence that Heather received. The Reed brothers would never have been brought to justice had she not decided to inform the police about their complicity in the Ufert murder. Her initial assistance, while it did not mature into testimony on behalf of the State, still helped the prosecution's cause. Additionally, there is a significant difference in her role in the murder. Murder was not a crime that she bargained for when she lured Ufert and his car to the scene of the crime. She and the Reeds had engaged in car hijacking before and no one was killed. While we know that Lenn, Glenn, and Andre fired shots into the body of Ufert, it is a matter of speculation whether she administered the fourth shot and, if so, what circumstance she was under when she did so. We do know that the fourth shot inflicted a nonfatal wound.

Andre Cunningham received remarkably lenient treatment for his

role in the murder. The record does not reflect what the prosecution did, if anything, to promote his time-served sentence for the armed robbery conviction that stemmed from his role in this murder. It is unclear how much punishment he actually received for that criminal conduct. But, given the conduct that he engaged in, it was not very much.

The Reed brothers' sentences, as a practical matter, condemn them to a life of imprisonment. While there is an air of unfairness where an active accomplice finds freedom before the defendants even file briefs on appeal from their convictions, the Reed brothers miss the simple difference between them and Andre Cunningham. The three are clearly not similarly situated. The prosecution pursued the Reed brothers as defendants. To do so, it needed evidence. It obtained that evidence from Andre Cunningham, who became a prosecution witness. As this case graphically demonstrates, the criminal justice system treats those who sit in a witness chair far differently than those who sit at counsel's table as criminal defendants.

The promise of freedom offers immeasurable value in procuring testimony. Its worth is greater than any other commodity that could be offered, a circumstance that prosecutors need bear in mind when using it in exchange for evidence. However, we know of no constitutional constraint that prevents its use. The only constraint is how freedom's promise infects the value of the purchased testimony, a constraint tested by the defense in this case. If due process required comparable treatment of cohorts in crime regardless of their decision to turn State's evidence, due process would bring a halt to many valid prosecutions. The State would be compelled to forego the prosecution of anyone, rather than use accomplice testimony to convict those participants considered most culpable. Disparate treatment between an accomplice witness and the accomplices against whom he testifies provides no basis for constitutional relief.

●9 Finally, both defendants challenge the constitutionality of their extended-term prison sentences for the offense of first-degree murder. At sentencing, the trial judge understandably determined that the murder of Michael Ufert was exceptionally brutal indicative of wanton cruelty. That determination extended the range of punishment beyond the prescribed maximum punishment available, absent the finding. Instead of a maximum 60-year prison term, the finding empowered the sentencing judge to impose up to 100 years of imprisonment. In the case of Lenn Reed, it enabled the judge to enhance punishment by 15 years. The same finding allowed the punishment of Glenn Reed to exceed the maximum prison term otherwise available by 10 years.

We are asked to examine the statutory sentencing scheme

employed in this case, in light of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), a case in which the United States Supreme Court held a New Jersey hate-crime statute unconstitutional because it commissioned judges to make a factual finding that enhanced their power to punish beyond the maximum penalties prescribed for any given criminal offense.

We decided this precise issue in another case during the pendency of this appeal. *People v. Rush*, 322 Ill. App. 3d 1014, 748 N.E.2d 832 (2001). We found that the extended-term statutory sentencing scheme employed in this case was invalid under the constitutional rule pronounced in *Apprendi v. New Jersey*. Writing for the majority, Justice Welch wrote, "[T]here is an immense difference between (a) allowing state officers or government officials to make factual determinations, without any standard of proof, that may deprive an accused of his liberty and (b) allowing an accused to have those crucial facts proved by the State beyond a reasonable doubt to an accused's fellow citizens." *Rush*, 322 Ill. App. 3d at 1027-28, 748 N.E.2d at 843.

Here, the factual determination that this murder was set apart from other murders by its exceptionally brutal nature was made by a state officer rather than a jury of the defendants' peers. The constitutional guarantee to a trial at which facts critical to the measure of punishment are decided by fellow citizens rather than a public official cannot abide such a scheme. The constitutional promise of a trial by jury guarantees the right to have a jury determine those facts that determine the maximum sentence the law allows. *People v. Nitz*, 319 Ill. App. 3d 949, 969, 747 N.E.2d 38, 54 (2001). Accordingly, the extended-term sentences imposed in this case are constitutionally infirm.

It is clear that the sentencing judge believed that Lenn Reed was the most culpable participant in the crime. We agree. It is also clear that this was a particularly senseless and foul murder. After all, Michael Ufert's flight completed the hijacking objective, making all that occurred thereafter pure sport of human hunt and kill.

Since the trial judge felt that the crime warranted more than the maximum otherwise available, and since he determined that Lenn Reed was the worst of the participants, we will modify his first-degree murder sentence to 60 years of imprisonment, the maximum punishment the law allows us to impose upon the facts determined by a jury of his peers.

As previously stated, the Reed brothers are twins. They are alike in many ways, including their callous disregard for human life. However, their conduct was not identical, and the sentencing judge recognized that fact. Glenn Reed received a lesser sentence than his

twin brother. While we can readily conclude that the sentencing judge would have imposed the maximum sentence available upon Lenn Reed, we are uncertain whether, with less punishment available, he would continue to preserve some disparity in punishment and treat Glenn Reed more leniently than his brother. Accordingly, we vacate the 70-year sentence imposed upon Glenn Reed, and we remand for sentencing anew, consistent with the constitutional constraints determined by this decision.

For the reasons stated, we affirm the convictions, modify Lenn Reed's sentence for first-degree murder to a 60-year prison term, vacate Glenn Reed's sentence for first-degree murder, and remand to the sentencing judge for further proceedings consistent with this opinion.

No. 5—98—0777, Affirmed as modified.

No. 5—98—0778, Affirmed in part and vacated in part; cause remanded.

MAAG, P.J., and WELCH, J., concur.