THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWARD TENNEY, Defendant-Appellant.

Second District    No. 2—00—0199

Opinion filed April 29, 2002.—Rehearing denied May 23, 2002.

McLAREN, J., dissenting.

G. Joseph Weller and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, and Charles M. Schiedel, of State Appellate Defender's Office, of Springfield, for appellant.

Meg Gorecki, State's Attorney, of St. Charles (Martin P. Moltz and Diane L. Campbell, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GEIGER delivered the opinion of the court:

Following a jury trial, the defendant, Edward Tenney, was found guilty of first-degree murder (720 ILCS 5/9—1(a)(2) (West 1992)) and sentenced to a term of natural life imprisonment. On appeal, the de-

fendant argues that (1) he was not proved guilty beyond a reasonable doubt; (2) the trial court abused its discretion during *voir dire*; and (3) his sentence is invalid under the rule articulated in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). We affirm the defendant's conviction, but remand the cause for a new sentencing hearing.

## I. Background

On May 26, 1995, the defendant was indicted on one count of first-degree murder (720 ILCS 5/9—1(a)(2) (West 1992)) and two alternative counts of felony first-degree murder (720 ILCS 5/9—1(a)(3) (West 1992)). The indictment count charging first-degree murder alleged that on October 1, 1993, the defendant shot and killed the victim, Mary Jill Oberweis, in her home on Felton Road in Aurora. The two alternative felony murder counts alleged that the defendant, while committing the forcible felonies of home invasion (720 ILCS 5/12—11 (West 1992)) and residential burglary (720 ILCS 5/19—3 (West 1992)), performed acts which caused the victim's death.

On September 12, 1997, the State informed the trial court and the defendant that it would seek the death penalty upon a conviction. On October 6, 1997, the defendant's jury trial commenced. During *voir dire*, the defendant asked prospective jurors whether any of them had family members or friends with drug or alcohol problems. The State objected, arguing that the question revealed the particular facts of the instant case. The trial court sustained the objection and suggested that the defendant rephrase his question in broader terms. The defendant then asked prospective jurors how they would "handle" a person with a chemical dependency. Again, the State objected to the question and the trial court sustained the objection. The defendant did not ask any further questions regarding drugs or alcohol. The parties completed jury selection on October 8, 1997.

On October 9, 1997, the State began its case in chief. The State's primary eyewitness was Donald Lippert, who had also been charged with the victim's murder. The trial court required Lippert to participate in a competency hearing before testifying at trial. When questioned by the trial court, Lippert testified that he was able to remember things for the most part, but that he sometimes had trouble remembering small things that happened in the recent past. As an example, Lippert explained that he forgot what he ate for breakfast that morning. Lippert testified that he understood the oath and that he was required to tell the truth on the stand.

When further questioned by the defendant, Lippert admitted that he was on numerous medications, including Thorazine, Xanax, and

Zoloft, and that the medications made him sleepy. Lippert testified that the medications did not affect his long-term memory. When asked to identify the date, Lippert initially stated that it was September 9, and then correctly stated that it was October 9. The trial court found that Lippert was competent to testify at trial.

Lippert testified that he and the defendant were cousins. They shared a residence on Sheffer Road in Aurora during the time in question. Lippert testified that he "liked to rob houses." On October 1, 1993, Lippert had been using alcohol, marijuana, and cocaine. That evening, the defendant suggested that they go out. Lippert and the defendant started walking down Sheffer Road, both armed with .22-caliber "Ruger" pistols. After walking about a mile, the defendant pointed out a house on Felton Road. The defendant told Lippert that the house looked like it had guns or other valuables inside.

Once they reached the house, Lippert stood by trees along the side of the house, while the defendant looked through the windows. After looking through the windows, the defendant noticed that the house had an alarm system. Lippert suggested that they kick the door in. The defendant kicked the door open and they entered the house. Upon entering the house, Lippert went into a hallway where he saw some file cabinets. While trying to pry the file cabinets open, he heard screaming and a gunshot.

Lippert ran into the living room area and saw the victim bleeding from the face, trying to get up off a chair. Lippert then ran down a hallway, where he found the defendant. Lippert saw the defendant fire a shot into an empty bedroom. Lippert and the defendant went back to the living room, where the victim was. The defendant pushed the victim back into her chair and acted like he was going to shoot her. Instead, the defendant stated that his gun had jammed and he told Lippert to shoot the victim. At first, Lippert refused, but the defendant threatened to shoot him. Lippert then shot the victim.

Afterwards, Lippert and the defendant left through the back door and ran towards the cornfield across the street from the house. When Lippert crossed the street, he heard people yelling outside the house. The defendant fired multiple shots in the direction of the voices. Lippert and the defendant hid in the cornfield for a period of time. When they finally exited the cornfield, the defendant asked Lippert for his gun. Lippert gave the defendant his gun.

On cross-examination, Lippert acknowledged that he was addicted to alcohol, marijuana, and cocaine. Lippert admitted that he had two prior convictions of burglary, a prior conviction of residential burglary, and a prior conviction of armed violence. Lippert also acknowledged that the State agreed to reduce his charges in this case and in other pending cases in exchange for his testimony.

Several other witnesses testified on behalf of the State. Ken Johannessen, the victim's next-door neighbor, testified that on October 1, 1993, at approximately 9 p.m., he heard a crash outside. He then walked outside his home and heard the alarm from the victim's home. He then heard two gunshots that sounded as though they were coming from the victim's driveway. After the first two gunshots, he ran towards the bushes between his home and the victim's home and heard four more shots. These shots were much louder than the first shots and came from a different direction. He heard a person running on the concrete and then saw a car drive south on Felton Road. He called to his wife JoAnn, and they entered the victim's home through the back door. He called 911 while his wife tended to the victim. Before leaving the house, he found that the back door was damaged and the inside trim had been split away.

JoAnn Johannessen testified that she entered the victim's home first and found the victim lying on a chair in the family room, unconscious and bleeding from the head. She lifted the victim's head to try to stop the bleeding. After the police arrived, she retrieved a sheet and covered the victim. When retrieving the sheet, she noticed a bullet casing on the floor of the hallway. She did not touch the casing but pointed it out to a police officer.

Deputy Jack Caudill of the Kane County sheriff's department also testified for the State. Deputy Caudill testified that, on October 1, 1993, at approximately 9 p.m., he and his partner, Deputy Thomas Friedrich, were dispatched to 1131 Felton Road in Aurora. After arriving, Deputy Caudill found JoAnn Johannessen holding the victim's head, which was bleeding from the mouth and the back of the head. At that time, Deputy Caudill looked around to make sure that nobody else was in the house. Deputy Caudill found a bullet casing on the floor of the hallway by the master bedroom and two bullet casings a few feet away from the victim. Deputy Caudill placed paper cups over the casings without touching them. Deputy Caudill did not remember if JoAnn Johannessen pointed out a casing to him.

Officer Michael Drawhorn of the Illinois State Police testified for the State. Officer Drawhorn testified that he collected the casings under the paper cups. Officer Drawhorn also recovered a bullet in the wall of the master bedroom. Officer Drawhorn noted damage to a file cabinet located in a small room.

Dr. Shaku Teas testified that he performed the victim's autopsy. Dr. Teas found one entrance-type gunshot wound on the left side of the victim's head above the ear and another on the upper lip. Dr. Teas recovered one bullet from the brain and fragments of another bullet from the jaw. In Dr. Teas's opinion, the wound to the brain was fatal.

Dr. Teas also testified that the wound to the jaw also could have been fatal.

Officer Michael Gumz of the Aurora police department testified for the State. Officer Gumz testified that on October 14, 1992, he arrested the defendant at his residence on Sheffer Street on an unrelated warrant. Officer Gumz testified that, at the time of the arrest, the defendant was in possession of a .22-caliber "High Standard" pistol.

Dan Gunnell testified that he was a forensic scientist with the Illinois State Police. Gunnell testified that he examined the shell casings found at the scene, the "High Standard" pistol recovered from the defendant, and a "Ruger" pistol that police also recovered. Based upon his examination, Gunnell determined that one of the shell casings was in fact fired by the "High Standard" pistol that had been recovered from the defendant. Gunnell also determined that two of the shell casings were fired by the "Ruger" pistol. Gunnell did not find any mechanical malfunctions with either gun.

The defendant did not present any evidence during his case in chief.

On October 17, 1997, the jury found the defendant guilty on all three counts alleged in the indictment. On November 7, 1997, the trial court conducted a hearing on the defendant's eligibility for the death penalty. The defendant had earlier waived his right to have the jury determine his eligibility for the death penalty and sentence. The trial court found the defendant eligible for the death penalty under section 9—1(b)(6) of the Criminal Code of 1961 (720 ILCS 5/9—1(b)(6) (West 1992)). In finding the defendant eligible, the trial court made findings that (1) the defendant was over the age of 18; (2) the victim was murdered in the course of the felonies of burglary and home invasion; (3) the defendant acted with intent to kill or with the knowledge that his acts created the strong probability of death or great bodily harm; (4) the defendant inflicted injuries substantially contemporaneously with Lippert; and (5) the defendant was legally accountable for Lippert's conduct. See 720 ILCS 5/9—1(b)(6) (West 1992).

On November 18, 1997, the defendant filed a motion to reconsider his death penalty eligibility. On May 20, 1999, at the hearing on the motion to reconsider, the State withdrew its request for the death penalty, stating:

"After an evaluation of the evidence, the People's position is that there is insufficient proof beyond a reasonable doubt in the Oberweis case and certainly in any other evidence that I'm aware of, to sustain the People's burden beyond a reasonable doubt on the qualification for the death penalty on the felony murder rationale, and

for that reason, Judge, the People will withdraw the request on that basis, and the way it would stand right now, there would be no qualification so there would be no possibility of death for the Oberweis conviction."

However, the trial court never rendered a decision on the defendant's motion to reconsider his death penalty eligibility.

On June 17, 1999, the trial court held a sentencing hearing. At the hearing, the court merged the felony first-degree murder counts into the first-degree murder count. The trial court found that the defendant's conduct was exceptionally brutal and heinous, indicative of wanton cruelty. See 730 ILCS 5/5—8—1(a)(1)(b) (West 1992). The trial court therefore imposed a life sentence. After the denial of his postsentencing motions, the defendant filed a timely notice of appeal.

## II. Discussion

### A. Sufficiency of the Evidence

The defendant's first argument on appeal is that he was not proved guilty beyond a reasonable doubt. The defendant argues that Lippert's testimony was so incredible that no rational jury could have believed it. The defendant also argues that, aside from Lippert's testimony, there was no physical evidence connecting him to the murder.

When considering a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant. *People v. Steidl*, 142 Ill. 2d 204, 226 (1991). The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The determination of the weight to be given to the witnesses' testimony, their credibility, and the reasonable inferences to be drawn from the evidence are the responsibility of the fact finder. *People v. Byron*, 164 Ill. 2d 279, 299 (1995).

A conviction shall not be reversed simply because the defendant claims a witness is not credible. *People v. Smith*, 177 Ill. 2d 53, 74 (1997). However, accomplice testimony should be cautiously scrutinized on appeal. *People v. Holmes*, 141 Ill. 2d 204, 242 (1990). Although subject to scrutiny, the testimony of an accomplice is sufficient to sustain a conviction " 'if it convinces the jury of the defendant's guilt beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Williams*, 147 Ill. 2d 173, 233 (1991), quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Where weaknesses in the accomplice's testimony existed, the weaknesses should have been readily apparent to the jury. *Williams*, 147 Ill. 2d at 234; *People v. Morrow*, 303 Ill. App. 3d 671, 678 (1999).

■ The offense of first-degree murder is defined as follows:

"(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

\*\*\*

(2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another[.]" 720 ILCS 5/9—1(a)(2) (West 1992)).

In order to prove murder, it is not necessary to show that the defendant had a specific intent to kill or to do great bodily harm, or that he knows with certainty that his acts will achieve murderous results. *People v. Crane*, 308 Ill. App. 3d 675, 682 (1999). It is sufficient to show that the defendant voluntarily and willfully committed the act, the natural tendency of which was to destroy another's life. *Crane*, 308 Ill. App. 3d at 682.

■ After carefully reviewing all of the evidence, and when viewing that evidence in the light most favorable to the State, we believe that a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Lippert's testimony indicates that the defendant shot the victim in the head during a home invasion and burglary. Lippert provided a complete account of the murder, including his own role in the crime.

Contrary to the defendant's assertion, the State was also able to provide independent corroboration of many important aspects of Lippert's testimony. For example, Lippert testified that the victim had an alarm system and that he and Lippert decided to kick the door open anyway. Such testimony was corroborated by Ken Johannessen's testimony that he heard a loud crash and the alarm from the victim's house. Ken Johannessen also testified to finding damage to the back door. Additionally, Lippert's testimony that he discovered the victim bleeding from the head while sitting in the living room chair was corroborated by JoAnn Johannessen, who found the victim in the living room chair bleeding from the head.

Lippert's testimony was also consistent with the physical evidence recovered from the scene. Lippert testified to hearing the first shot, seeing the defendant fire a shot into the bedroom, and firing one shot at the victim himself. Lippert also testified that when he heard the first shot he was trying to pry open file cabinets. Deputy Caudell testified that he found two casings by the victim and a casing in the hallway leading to the bedroom. Officer Drawhorn found a bullet lodged in the bedroom wall and noted damage to the file cabinets. Dr. Teas recovered two bullets from the head of the victim.

Finally, Officer Gumz found the defendant in possession of a .22-

caliber "High Standard" pistol. This gun was later determined to have fired one of the casings found at the scene. Such evidence substantially corroborates Lippert's testimony. As there was no contradictory testimony to impeach Lippert's testimony, we believe that a rational trier of fact could have believed Lippert's testimony.

Furthermore, the jury was fully aware of the weaknesses surrounding Lippert's credibility. During Lippert's testimony, the jury became aware of Lippert's involvement in the murder, his deal with the State, his prior convictions, and his chemical dependency. We note that the trial court instructed the jury with Illinois Pattern Jury Instructions, Criminal, No. 3.17 (3d ed. 1992), cautioning it that, as Lippert was an accomplice, his testimony should be viewed with suspicion. The jury was in the best position to judge Lippert's testimony, and we see no reason to disturb its determination. Rather, for the reasons discussed above, we believe that the State introduced sufficient evidence to prove the defendant's guilt beyond a reasonable doubt.

### B. *Voir Dire*

The defendant next argues that the trial court abused its discretion during *voir dire*. Specifically, the defendant argues that the trial court deprived him of a fair and impartial jury by refusing to allow him to question prospective jurors about their personal experiences with friends or family who may have suffered from substance abuse.

■ The purpose of *voir dire* is to assure the selection of an impartial panel of jurors who are free from bias or prejudice. *People v. Williams*, 164 Ill. 2d 1, 16 (1994). The primary responsibility for conducting *voir dire* lies with the trial court, and the scope of the examination rests within its discretion. *People v. Terrell*, 185 Ill. 2d 467, 484 (1998). The trial court possesses great latitude in deciding what questions to ask during *voir dire*. *People v. Gregg*, 315 Ill. App. 3d 59, 65 (2000).

■ On review, an abuse of the court's discretion will be found only when the record reveals that the trial court's conduct thwarted the selection of a fair and impartial jury. *Terrell*, 185 Ill. 2d at 484. The standard for evaluating a court's exercise of discretion during *voir dire* is whether the questions posed and procedures employed created a reasonable assurance that prejudice would be discovered if present. *People v. Lanter*, 230 Ill. App. 3d 72, 75 (1992). Reasonable limitations on *voir dire* do not deprive a litigant of his right to an impartial jury. *Lanter*, 230 Ill. App. 3d at 75.

■ Although the defendant is entitled to an impartial jury, he is not entitled to select particular jurors. *People v. Peeples*, 155 Ill. 2d

422, 463 (1993). The venire should not be questioned regarding how they would act given particular aggravating circumstances. *Terrell*, 185 Ill. 2d at 484. Questions should confirm the ability of prospective juries to put aside feelings of bias and decide the case on the evidence presented. *People v. Strain*, 306 Ill. App. 3d 328, 337 (1999).

In *Strain*, the court was faced with gang membership as an area of potential bias for the jury. *Strain*, 306 Ill. App. 3d at 336. The trial court asked the venire whether any of their family members or friends had ever been involved with street gangs. *Strain*, 306 Ill. App. 3d at 336. On appeal, the court specifically found that the trial court's question was improper and did not inquire whether the venire was free of any bias towards gang members. *Strain*, 306 Ill. App. 3d at 336-37. The court reasoned that the trial court's question was too narrow and depended on the venire to volunteer information not within the question's scope. *Strain*, 306 Ill. App. 3d at 337.

■ In the instant case, the defendant phrased his question in a similar manner to the question at issue in *Strain*. See *Strain*, 306 Ill. App. 3d at 336. The defendant asked the venire if they had family members or friends with substance abuse problems. After sustaining the State's objection to the first question, the court suggested that the defendant rephrase the question in broader terms. However, the defendant again phrased his question improperly. He asked the venire how they would "handle" someone with a chemical dependancy. As in *Strain*, neither of the defendant's questions was specifically probative of the venire's feelings toward drugs and alcohol. Rather than rephrase the question a third time, the defendant abandoned the line of questioning. Contrary to the defendant's assertion, the trial court never did prohibit the defendant from questioning the venire about their views regarding alcohol and drugs. As such, we find that the trial court did not commit error.

In so holding, we note that *People v. Lanter*, 230 Ill. App. 3d 72 (1992), relied upon by the defendant, is distinguishable from the case at bar. In *Lanter*, the defendant was charged with aggravated battery and assault. *Lanter*, 230 Ill. App. 3d at 72. The defendant planned to raise the affirmative defense of intoxication at trial. *Lanter*, 230 Ill. App. 3d at 73. During *voir dire*, the defendant attempted to ask a prospective juror whether she had any viewpoints concerning alcohol and drugs that would cause her to favor one of the parties. *Lanter*, 230 Ill. App. 3d at 73. The trial court prohibited that line of questioning entirely. *Lanter*, 230 Ill. App. 3d at 74. On review, the court held that the trial court's failure to allow any questions regarding the venire's feelings toward drugs and alcohol was an abuse of discretion. *Lanter*, 230 Ill. App. 3d at 76.

Unlike the defendant in *Lanter*, the defendant here did not specifically ask the venire if they had any viewpoints concerning alcohol and drugs that would cause them to favor one of the parties. Although the defendant could have properly inquired about the venire's bias towards substance abuse, the defendant's questions were not proper. Next, unlike the defendant in *Lanter*, the defendant in this case did not raise an affirmative defense of intoxication. Accordingly, we do not believe that this case is comparable to *Lanter* and hold that the trial court did not abuse its discretion by sustaining the State's objection to the defendant's questions.

## C. *Apprendi*

The defendant's final argument on appeal is that his sentence is invalid under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). The defendant argues that the maximum statutory penalty for first-degree murder is 60 years' imprisonment. 730 ILCS 5/5—8—1(a)(1)(a) (West 1992). The defendant argues that the trial court impermissibly enhanced his sentence to life imprisonment without submitting the aggravating factors to the jury.

In *Apprendi*, the United States Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. The Supreme Court reasoned that it is unconstitutional for the legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2363. In order to determine whether *Apprendi* has been violated, we must first determine the statutory maximum penalty for first-degree murder.

Section 5—8—1(a)(1)(a) of the Unified Code of Corrections (the Code) provides that the sentence for first-degree murder shall range from 20 to 60 years' imprisonment. 730 ILCS 5/5—8—1(a)(1)(a) (West 1992). The Code also gives the trial court the discretion to sentence a defendant to a longer term of imprisonment, up to and including life imprisonment, if it finds that (1) the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty (730 ILCS 5/5—8—1(a)(1)(b) (West 1992)); or (2) any of the death penalty qualifying factors are present (720 ILCS 5/9—1(b) (West 1992)).

On two prior occasions, this court has considered what constitutes the statutory maximum penalty for first-degree murder. See *People v. Rivera*, No. 2—98—1662, slip op. at 22 (December 5, 2001); *People v.*

*Swift*, 322 Ill. App. 3d 127, 130-31 (2001). In *Swift*, this court held that, for purposes of *Apprendi*, the prescribed maximum term of imprisonment for first-degree murder is 60 years. *Swift*, 322 Ill. App. 3d at 130-31. We reasoned that section 5—8—1(a)(1)(a) of the Code clearly provides a sentencing range of 20 to 60 years' imprisonment and that a sentence for life imprisonment may be imposed only upon the existence of certain factors, such as one of the death penalty qualifiers or if the crime was committed in a particularly brutal and heinous manner. *Swift*, 322 Ill. App. 3d at 128-30. We determined that such factors had to be proved beyond a reasonable doubt to a jury and remanded for a new sentencing hearing. *Swift*, 322 Ill. App. 3d at 131. Several other Illinois courts have reached the same conclusion as *Swift*. See *People v. Reed*, 324 Ill. App. 3d 671, 685 (2001); *People v. Nitz*, 319 Ill. App. 3d 949, 969 (2001); *People v. Joyner*, 317 Ill. App. 3d 93, 110 (2000).

However, in *Rivera*, this court held that the prescribed maximum term of imprisonment for first-degree murder is a term of natural life. Adopting the reasoning contained in *People v. Vida*, 323 Ill. App. 3d 554, 572 (2001), the *Rivera* court explained that the Code's various sentencing schemes should be read in conjunction with one another and that, when read as a whole, the Code specifically authorizes a sentence of life imprisonment for a conviction of first-degree murder. *Rivera*, slip op. at 25. The *Rivera* court further explained that a defendant convicted of first-degree murder is confronted, at that point, with the possibility that he is "eligible" to receive a sentence of life imprisonment. *Rivera*, slip op. at 27.

■ We conclude that the reasoning in *Swift* and its progeny is more persuasive and decline to follow *Rivera*. We acknowledge that section 5—8—1(a)(1)(b) of the Code specifically authorizes a term of life imprisonment. However, the reasoning in *Rivera* is flawed because under the Code a defendant is not "eligible" for a sentence of life imprisonment upon a conviction of first-degree murder. Rather, at that point, the defendant may be sentenced to life imprisonment, but only upon the existence of certain aggravating factors. See 730 ILCS 5/5—8—1(a)(1)(b) (West 1992). As proof of these factors increases the prescribed range of penalties to which a criminal defendant is exposed, we believe that *Apprendi* requires that they must be submitted to a jury. *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63.

■ Turning to the instant case, the trial court imposed a sentence that exceeded the maximum sentence permitted under section 5—8—1(a)(1)(a) of the Code. In sentencing the defendant to an extended term of life imprisonment, the trial court made findings that the

defendant's actions were exceptionally brutal and heinous and were indicative of wanton cruelty. For the reasons discussed above, the State was obligated to prove these facts to a jury beyond a reasonable doubt.

In so ruling, we also reject the State's contention that the supreme court's recent decision in *People v. Ford*, 198 Ill. 2d 68 (2001), governs the outcome in this case. In *Ford*, the court held that, in an instance where a defendant is found eligible for the death penalty by proof beyond a reasonable doubt, the imposition of an extended-term prison sentence does not violate *Apprendi*. *Ford*, 198 Ill. 2d at 73-74. We believe that the facts of the instant case are distinguishable from *Ford*. Here, although the trial court entered an order finding that the defendant was eligible for the death penalty, the defendant filed a motion to reconsider the finding, challenging the proof of his eligibility. Prior to the hearing on the defendant's motion, the State conceded that there was insufficient evidence to support the trial court's eligibility finding, commenting:

> "After an evaluation of the evidence, the People's position is that there is insufficient proof beyond a reasonable doubt in the Oberweis case and certainly in any other evidence that I'm aware of, to sustain the People's burden beyond a reasonable doubt on the qualification for the death penalty on the felony murder rationale, and for that reason, Judge, the People will withdraw the request on that basis, and the way it would stand right now, there would be no qualification so there would be no possibility of death for the Oberweis conviction."

Subsequently, the parties agreed that there was no need to go forward with the defendant's motion to reconsider. Although the trial court's eligibility finding was not formally vacated, in light of its admission that there was insufficient evidence to support the finding, the State cannot now assert on appeal that the defendant was proved eligible for the death penalty beyond a reasonable doubt. We therefore believe that the factors of brutality and heinousness should have been submitted to the jury and proved beyond a reasonable doubt. Accordingly, we vacate the defendant's sentence and remand this cause to the trial court for resentencing on the murder conviction.

### III. Conclusion

For the foregoing reasons, we affirm the defendant's conviction of first-degree murder, vacate the sentence of life imprisonment, and

remand the cause to the trial court to conduct a sentencing hearing consistent with the views expressed herein.

Affirmed in part and vacated in part; cause remanded with directions.

BYRNE, J., concurs.

JUSTICE McLAREN, dissenting:

I respectfully dissent as to that portion of the majority opinion vacating defendant's sentence pursuant to *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). The majority commences its analysis by indicating that "we must first determine the statutory maximum penalty for first-degree murder" in determining whether *Apprendi* has been violated. 329 Ill. App. 3d at 441.

To the contrary, I believe we must first determine if Illinois' statutory scheme for murder comports with *Apprendi*. If it does, then only the maximum penalty of death, as delimited in *Apprendi*, is reviewable.

Illinois' statutory scheme for murder comports with *Apprendi* because it does provide that a jury must find, beyond a reasonable doubt, those elements that would or could result in the imposition of the death penalty. In *People v. Davis*, 205 Ill. 2d 349 (2002), the court stated:

> "[T]he Supreme Court, in *Apprendi*, *specifically excluded capital sentencing schemes* in which eligibility for the death penalty must be proven to a jury beyond a reasonable doubt from its scope:
>
> ' " *** What the cited cases hold is that, once a jury has found the defendant guilty of all the elements of an offense which carries as its maximum penalty the sentence of death, *it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed...* ." ' " (Emphasis added.) *Davis*, 205 Ill. 2d at 376, quoting *Apprendi*, 530 U.S. at 497, 147 L. Ed. 2d at 459, 120 S. Ct. at 2366, quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 257 n.2, 140 L. Ed. 2d 350, 377 n.2, 118 S. Ct. 1219, 1237 n.2 (1998) (Scalia, J., dissenting, joined by Stevens, Souter and Ginsburg, JJ.).

Illinois' statutory scheme grants greater rights to the defendant because it not only comports with the federal constitutional requirements but also grants the defendant the right to have a jury decide whether the maximum penalty of death should be imposed. Having determined that Illinois' scheme has passed muster, further review must cease because those schemes are excluded by *Apprendi*. See *Davis*, 205 Ill. 2d at 376.

There are presently two lines of cases declaring that the maximum penalty for murder is 60 years' imprisonment and life imprisonment, respectively. See *People v. Swift*, 322 Ill. App. 3d 127 (2001) (60 years); *People v. Rivera*, No. 2—98—1662, slip op. at 13 (December 5, 2001) (life imprisonment). I submit that *Davis* preempts those lines of cases by declaring that there is only one statutory murder scheme and that it includes death as its maximum penalty. *Davis* stated unequivocally in quoting *People v. Brownell*, 79 Ill. 2d 508 (1980), "We noted that 'there is only one offense of murder in Illinois; no distinction is made between capital and non-capital murder.' [Citation.] Further, '[t]here is no offense of "aggravated," as opposed to simple, murder, in Illinois. *There is simply one murder statute, which includes within it a provision for the imposition of the death sentence.*' " (Emphasis added.) *Davis*, 205 Ill. 2d at 377.

Accepting *Davis*'s declaration that there is only one murder statute in this state and that statute imposes death, then it must follow that death is the maximum penalty. Since *Apprendi* has only one criterion for the review of murder that includes death as the maximum penalty and Illinois grants greater rights than that required under the federal constitution, any further review or analysis is unnecessary and unwarranted regardless of the penalty imposed.

This interpretation is also consistent with the basic underlying principle set forth in *Apprendi*. In *Apprendi*, the defendant pleaded guilty to a Class 2 firearm crime and was found guilty of a Class 1 hate crime. Most importantly, the sentence imposed on the hate crime was *greater* than any sentence that could have been imposed for the Class 2 crime to which he pleaded. In *Apprendi*, the United States Supreme Court held that, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury[ ] and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. In this case, defendant pleaded guilty to murder, was found guilty of murder, and was *not* sentenced to the maximum penalty *let alone to a penalty beyond the prescribed statutory maximum for the offense of murder*. Thus, *Apprendi* is factually distinguishable.

I, therefore, respectfully dissent.