THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GITSON CATES, Defendant-Appellant.

First District (5th Division)   No. 80—3120

Opinion filed December 17, 1982.

Steven Clark and Kenneth Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, David L. King, and James F. Sullivan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MEJDA delivered the opinion of the court:

Following a bench trial, defendant Gitson Cates was convicted of involuntary manslaughter (Ill. Rev. Stat. 1981, ch. 38, par. 9—3) and was sentenced to three year's imprisonment. On appeal, he contends that: (1) the trial court's denial of his motion for a continuance deprived him of his constitutional right to be defended by counsel of his own choice; and (2) the evidence was insufficient to establish recklessness.

The record shows that defendant was arraigned on August 15, 1978. On that date, attorney Howard T. Savage filed his appearance on behalf of defendant. On August 25, 1978, the case was continued by agreement to September 21, 1978, and then, on defendant's motion to October 16, 1978. Then, from that date until August 14, 1980, the case was continued 18 times, each time by agreement. Thereafter, continuances were entered until September 15, 1980, on defendant's motion, and until September 22, 1980, on order of the trial court. On the latter date, a hearing on pretrial motions commenced, lasting until September 24, 1980. The case was then continued to September 25, 1980, for jury selection, but due to an insufficient number of avail-

able veniremen on that date, the case was held on call and continued until September 29, 1980.

On that date the People answered ready for trial. James Bell, an attorney who had assisted Mr. Savage and had argued a pretrial motion to suppress, informed the trial court that Mr. Savage could not be present that day. Mr. Bell stated that he had been informed by Mr. Savage's wife that Mr. Savage was to undergo oral surgery that day at 2 p.m. On this basis the trial court granted defendant a continuance until the following afternoon at 2 p.m., requesting that Mr. Bell present an affidavit relating to the continuance on the following morning.

On September 30, 1980, Mr. Bell informed the trial court that Mr. Savage was still unavailable due to illness and that defendant did not want to go to trial without the assistance of Mr. Savage. In response to the trial court's questioning, Mr. Bell stated that he had been involved in the case for a month and a half, that he shared office space with Mr. Savage, and that they work together on a case-by-case basis in a loosely defined association as independent practitioners. Mr. Bell stated that he had been admitted to the Illinois Bar since 1978, and the Tennessee Bar since 1976, having practiced in Tennessee for three and a half to four years. In his opinion Mr. Savage would be able to try the case "within a week or so." When asked by the court if he had brought the requested affidavit, Mr. Bell responded that he had not, since he "simply forgot about it."

The trial court denied the defendant's motion for a continuance stating as grounds the following:

"THE COURT: Now, for the record [since August 15, 1978] *** there's been a series of continuances, twenty-one up until the point in time where I had put it on call for priority and the 22nd time it was put on for 9-22, top priority. [Mr. Bell] was advised of that, Mr. Savage was advised of that. We cleaned the calendar for the entire week so that this case could be heard. We proceeded last week to hear the motion to suppress, *** [t]hen *** we ran into a problem on Thursday with a jury. Friday Mr. Savage indicated he had to go to a Pattern Jury Instruction Conference. With deference we just gave him Thursday and Friday both off putting the case over until Monday.

Yesterday [Mr. Bell] indicated again clearing this *** second entire week for this case. And I might note during the motion to suppress [Mr. Bell] *** ably represented [defendant] *** and [defendant] made no objections to that whatsoever and my major concern in this matter is competency of counsel.

I have nothing to indicate that there is any less competency by this attorney than any other attorney that would try this case. We have cleared the deck again this week. Yesterday [Mr. Bell] informed me of Mr. Savage's *** oral surgery ***. Therefore, we put the case over one more day, sent back the jury *** in due deference to Mr. Savage so that he could be here *** with Mr. Bell.

*** Mr. Bell is a competent attorney licensed to practice in this case with a background of experience. I see no reason to postpone it any further and I'd like to begin the selection of the jury at 2:30."

After the court's denial of the continuance, Mr. Bell stated that it was his best judgment to proceed with a bench trial. The court then granted a recess to allow Mr. Bell to discuss the matter with defendant and also with Mr. Savage. Following the recess, Mr. Bell announced that he and defendant had spoken by telephone to Mr. Savage and that defendant would waive his right to a jury trial. Then the following colloquy occurred between the trial court and defendant:

"THE COURT: What are your thoughts in relationship to this? Is this satisfactory to you that we go ahead with the bench and Mr. Bell represent you in this case?

THE DEFENDANT: Yes.

THE COURT: Or is this a feeling on your part yet because you paid your compensation to Mr. Savage that Mr. Savage should represent you whether it be bench or jury trial?

THE DEFENDANT: I talked to Mr. Savage and he and Mr. Bell and I decided that we'd go with a bench.

THE COURT: That is perfectly agreeable to you, there is no pressure or coercion on you to do so, you are doing it for your own free will and volition? It is your life we are talking about and your case. We want to make sure this is your desire.

THE DEFENDANT: Yes.

THE COURT: It is?

THE DEFENDANT: Yes."

Mr. Bell then filed his appearance and the case was continued until October 1, 1980. On that date Mr. Bell informed the court that the requested affidavit had not yet been typed, and the case proceeded to trial.

The State presented testimony that on July 14, 1978, at approximately 7 p.m., defendant and his wife, Linda Cates, were standing outside their residence located at 3938 South Park Avenue. Also present was Linda's sister, Rene Williams, as well as Angela Moore

and Gloria Lewis. Williams asked Linda where she and her husband were going. Linda replied that she didn't know where defendant was going, but that she was going with Williams. Defendant then walked over to Linda and told her she wasn't going anywhere. He grabbed her arms and pulled her away. He then pushed her six to seven times. When Linda attempted to dodge him, defendant put his arm around her waist, turned her around, and pushed her again. Defendant said to Linda, "Let's go upstairs." When Linda attempted to go across the street in the direction of her mother's house, defendant grabbed her by the arm, turned her around, and pushed her up the walkway towards their apartment building.

Defendant testified that after they entered the apartment he sat on the arm of a chair while Linda removed her jewelry. They were both in the living room. Linda walked toward him and he again grabbed her by the arm. She pulled free and started swinging wildly, hitting defendant on the face and chest. Defendant then came up from the chair swinging with both hands. He testified that he began hitting her somewhere below her breasts. On cross-examination he stated he didn't know where he hit her. Although Linda's punches were hurting him, he suffered no physical injury, received no cuts or bruises, and the blows did not knock him off the chair. At the time he was not afraid for his life.

Defendant further testified that he arose from the chair. Then, using both hands, and from a distance of about eight inches, he pushed Linda away. She then went backward across the room, her thighs hitting the top edge of a record player located a distance of 12 to 14 feet from where she had stood. According to defendant, as Linda attempted to brace herself on the record player, her hands slipped and she fell, hitting her head on the wall. Defendant could not recall if she then hit her head on the floor. Defendant said that he did not intend to hurt his wife, that he did not strike her in the face, that he was not angry with her, and that he did not think she would fall when he pushed her or that she would suffer any injury.

After some time, paramedics arrived at the scene. Paramedic Cortez Trotter testified that when he entered the apartment he saw Linda slumped on the couch. Her eyes were closed, swollen and bruised, as were her cheeks. She was bleeding from the mouth and from the left side of her face. Trotter felt for her pulse and called out to her but she did not respond. Then, while paramedics Kelly and Vasquez tended to Linda, Trotter spoke to defendant. Trotter asked defendant what happened and defendant replied that Linda slipped and fell. Upon hearing this response, Trotter said "Bullshit." Defend-

ant then replied in a stuttering voice that he had hit the victim. Trotter continued and asked, "You hit her with what?" Defendant replied, "I-I-I hit her with my fist." Trotter said, "Come on, man, you hit her with your fist? What else did you hit her with?" Defendant answered, "Nothing, we were fighting. I just hit her. I was hitting her with my fist." Trotter later accompanied Linda to Michael Reese Hospital.

Officer Thomas Minton testified that while at Michael Reese Hospital he heard defendant state that he struck his wife. Minton asked defendant how many times he hit her. Defendant answered that he hit her three or four times in the face. Minton recorded this statement in his police report a few hours later.

Dr. Lawrence Ferguson, the chief of neurosurgery at Michael Reese Hospital, testified that an angiogram showed swelling and possible subdural hematomas on Linda's brain. He noted that the victim had a cut over her eye and some swelling. Dr. Ferguson performed a right frontal craniotomy on Linda. After opening Linda's skull under this procedure, Dr. Ferguson found that the brain was very swollen and red. He testified that this was an indication of acute subdural hematoma, which meant that severe stress had been applied to the brain. He stated his opinion that such stress is usually caused by trauma and that hitting the skull with a fist would be one example of such trauma. Dr. Ferguson stated that he had hoped to find a large blood clot or hematoma but instead found a swollen brain. The doctor went on to state that such swelling can often lead to permanent damage or death.

Dr. Yuksel Konakci, an assistant Cook County Medical Examiner, performed the autopsy on the victim on July 17, 1978. Dr. Konakci found a small suture laceration around the left corner of the left eye which showed some superficial bleeding or hemorrhage. In his opinion this hemorrhaging was caused by blunt trauma. He also observed several contusions on the victim's upper lip. Her face appeared to be swollen. Dr. Ferguson had testified earlier that after such surgery patients often get swelling around the eyes but not in the face. Dr. Konakci examined the brain and found it to be markedly swollen. Later, Dr. Konakci observed while another pathologist, Dr. Leestma, examined the brain. It was still markedly swollen. There were subdural hematomas on both sides. There was also severe edema or swelling. The doctor further observed what is called fungus cerebri, whereby the brain swells and protrudes into the occipital bones. Finally, Dr. Konakci observed small areas of contusion on the victim's brain. Based upon the above factors, it was Dr. Konakci's opinion that the cause of death was extreme cranial cerebral injury brought about

by blunt trauma.

OPINION

The defendant first argues that the trial court violated his sixth amendment right to counsel when it denied his motion for a continuance. He also contends that the court thereby coerced him into waiving his right to a jury trial and compelled him to accept representation by an attorney who was not adequately prepared to defend him.

Our supreme court has stated that the granting of a continuance to permit preparation for a case, or for the substitution of counsel, necessarily depends upon the particular facts and circumstances surrounding the request, and is a matter resting within the sound judicial discretion of the trial court. (*People v. Solomon* (1962), 24 Ill. 2d 586, 182 N.E.2d 736, *cert. denied* (1962), 371 U.S. 853, 9 L. Ed. 2d 87, 83 S. Ct. 94; see also *People v. Sedlacko* (1978), 65 Ill. App. 3d 659, 382 N.E.2d 363.) The granting of a continuance on the basis of the illness of defendant's counsel is also a matter residing within the discretion of the trial court. (*Sedlacko; People v. Wilson* (1975), 31 Ill. App. 3d 1067, 335 N.E.2d 546.) Furthermore, the failure to grant a continuance will not be held to be error unless there is a clear showing of an abuse of discretion (*People v. Nobles* (1980), 83 Ill. App. 3d 711, 404 N.E.2d 330), or unless the denial has embarrassed defendant in the preparation of his defense and has thereby prejudiced him. *People v. Canaday* (1971), 49 Ill. 2d 416, 275 N.E.2d 356; *Sedlacko.*

The defendant relies on *People v. Myles* (1977), 49 Ill. App. 3d 325, 364 N.E.2d 323, in support of his argument that he was denied his right to counsel of his choice because of the trial court's refusal to grant a one-week continuance so that Mr. Savage, his retained attorney, might be present. In *Myles*, an attorney who had appeared merely to request a continuance was held to trial. The attorney was the young associate of the defendant's retained counsel who was delayed getting into court that day. This young associate had been an attorney for only three months, had never tried a felony case, had no idea how to select a jury, and he repeatedly protested to the trial court that he was totally unqualified to undertake the defense of a client charged with murder. The appellate court reversed, finding that the trial court abused its discretion. The court noted that "[a]t no time did the court ask the defendant if she wanted [this attorney] to proceed on her behalf." (49 Ill. App. 3d 325, 326, 364 N.E.2d 323, 324.) In the instant case, the trial court found Mr. Bell to be quite competent, having a background of experience including 3½ to four years of practice before the Tennessee Bar. The trial court also noted

that Mr. Bell ably represented defendant at the earlier motion to suppress. At no time did Mr. Bell protest to the trial court that he was unqualified to undertake the defense of a client charged with involuntary manslaughter. Moreover, the trial court inquired as to whether defendant wanted to proceed with Mr. Bell instead of Mr. Savage and defendant indicated that he was satisfied with the services of Mr. Bell and that a bench trial was agreeable with him. Accordingly, it is apparent that the factors constituting abuse of discretion in *Myles* are simply not present in the case at bar.

■■ The record here demonstrates that defendant's attorney appeared to be completely competent, thoroughly prepared, and zealous in his representation of defendant. The trial court denied the defendant's motion for a continuance only after careful consideration of the surrounding circumstances including Mr. Bell's repeated failure to present an affidavit relating to Mr. Savage's illness. Further, defendant here freely and knowingly waived his right to a jury trial following a telephone consultation with Mr. Savage. Accordingly, we cannot say that the trial court abused its discretion in denying defendant's motion for a continuance or that defendant suffered any prejudice as a result of the denial of a continuance.

Defendant next argues that his conviction must be reversed since the record is devoid of any evidence tending to prove a material element of the offense of involuntary manslaughter, namely, that he performed a reckless act which resulted in the death of his wife.

Defendant basically argues here that the evidence does not adequately establish the particular acts which caused his wife's death. In support of this argument defendant cites facts in evidence which he claims tend to contradict paramedic Trotter's account of the events, particularly his statement regarding defendant's admissions at the scene. We find this argument wholly unconvincing. Initially, it is well settled that when a case is tried without a jury, it is the responsibility of the trial judge to determine the credibility of the witnesses and the weight to be given their testimony, and where the evidence is merely conflicting, a reviewing court will not substitute its judgment for that of the trier of fact who heard the evidence. (*People v. Woods* (1980), 81 Ill. 2d 537, 410 N.E.2d 866.) Here, we hold that the evidence in the record was sufficient to permit the trial court to determine that defendant's actions resulted in the victim's death. The defendant's own testimony supports the conclusion that he struck the victim and shoved her a distance of 12 to 14 feet across the room where her head collided with a wall, and since defendant is the only person who can testify to exactly what happened, the trial court was certainly not

compelled to accept his account as conclusive, but could consider also the surrounding circumstances and the probability of defendant's story. (See *People v. Towers* (1974), 11 Ill. App. 3d 467, 308 N.E.2d 223.) Paramedic Trotter testified that defendant told him that he hit the victim with his fists. Moreover, Investigator Minton testified that he heard defendant say he hit his wife in the face four or five times before she fell, hit the record player, and the wall. In addition, medical testimony established that the cause of death was extreme cranial cerebral injury brought about by blunt trauma. Lacerations were found around her left eye and several contusions were on her upper lip. Finally, there was also evidence of an argument between defendant and his wife just before they entered the apartment. The above circumstantial evidence adequately supports the trial court's determination that defendant acted, either by forcefully shoving the victim so that her head eventually hit the wall, or by repeatedly striking her in the face, or both, and that such acts by him resulted in her death. Accordingly, we reject defendant's argument that the material elements of the offense of involuntary manslaughter were not proved by competent evidence.

■■ ■ Finally, defendant contends that the mental element of recklessness was not proved beyond a reasonable doubt. He argues that the evidence established that his actions were reasonably designed to end the physical confrontation with his wife, that he did not push his wife hard, that he was not angry with her, and that he did not believe she would fall, nor did he intend to cause her any injury. We find this argument unavailing. To begin with, as we have noted above, the evidence was sufficient to allow the trial court to conclude that the victim died as a result of blows from defendant's fists, and death by such causes may clearly constitute involuntary manslaughter. (See, *e.g., People v. Towers* (1974), 17 Ill. App. 3d 467, 308 N.E.2d 223.) Even assuming, as defendant states, that the death resulted only from his actions in shoving his wife across the room, defendant's argument here is yet unavailing since no specific intention to kill or do great bodily harm is required to prove involuntary manslaughter. The only mental state required is the conscious disregard of a substantial and unjustifiable risk. (*People v. Bauman* (1975), 34 Ill. App. 3d 582, 340 N.E.2d 178.) To constitute recklessness under section 4—6 of the Criminal Code of 1961, such disregard must be a "gross deviation from the standard of care which a reasonable person would exercise in the situation." (Ill. Rev. Stat. 1981, ch. 38, par. 4—6.) Thus, defendant's subjective belief that his acts are justified or lawful is of little importance where such acts are deemed to be such a gross devi-

690

ation from the standard which a *reasonable person* would exercise in such a situation. The question of whether the acts deviated from such a standard, and thereby were reckless, is a question of fact to be determined by the trier of fact. *People v. Schwartz* (1978), 64 Ill. App. 3d 989, 382 N.E.2d 59.

From the record, the trial court could have concluded that defendant consciously disregarded a substantial and unjustifiable risk that the victim would fall and strike her head when he struck her with his fists and shoved her with a force sufficient to move her backwards 12 to 14 feet. Considering all the direct and circumstantial evidence presented, defendant was proved guilty of involuntary manslaughter beyond a reasonable doubt.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P.J., and WILSON, J., concur.