THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MATTHEW GIVENS, Defendant-Appellant.

First District (2nd Division) No. 1—03—3092

Opinion filed June 30, 2005.—Rehearing denied August 3, 2005.

Michael J. Pelletier and Scott F. Main, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, William Toffenetti, and Andrew Vrabel, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HALL delivered the opinion of the court:

Following a jury trial, defendant Matthew Givens was convicted of first degree murder and sentenced to 60 years' imprisonment. On appeal, defendant contends that his conviction should be reduced to involuntary manslaughter because his acts were merely reckless. Defendant also contends that his sentence is excessive. For the following reasons, we affirm.

On December 15, 1999, defendant pushed the victim, Keith Radloff, down a set of five stairs leading into Union Station in Chicago. Radloff landed headfirst onto a concrete landing and died shortly thereafter due to the severe injuries he suffered as a result of the fall.

The events that ultimately led to the deadly fall began at approximately 4 p.m. on December 14, 1999, when defendant, a bike messenger, and Radloff, a commuter on his way to Union Station, collided on the Franklin Street bridge in Chicago. Witness Robert McDonough testified that defendant fell off of his bicycle as a result of the collision but that Radloff continued to walk south on the bridge. Defendant immediately confronted Radloff, stating, "hey, what did you f------ hit me for?" Radloff replied, "I didn't hit you, you hit me" and kept walking. Defendant subsequently got onto his bike, pulled out a metal "u-shape" bike lock, raised his hand and swung the lock into the back of Radloff's head as he rode past him. Defendant rode his bicycle to the end of the block and circled in a driveway area. Meanwhile, Radloff approached a police car, reported the incident and pointed to defendant who, at that point, left the area.

At approximately 4 p.m. the next day, December 15, 1999, defendant and Radloff encountered each other again outside an office building located at 150 North Wacker Drive. According to witnesses, defendant was cursing at Radloff for almost pushing him in the river the previous day. Defendant was swinging a bike lock in his hand and he told Radloff that he was going to "kick his mother f------ a--." Nadine Lewis, a security guard on duty at the time, attempted to speak with defendant but he responded, "b----, you don't know what you

talking about" and told her she had nothing to do with the situation. John Wilkins, a fellow bike messenger, arrived during the altercation and also attempted to calm defendant down. Lewis and Wilkins testified that Radloff appeared to be nervous and afraid. Lewis also stated that Radloff tried to apologize to defendant and eventually walked away toward Union Station.

The evidence at trial revealed that defendant continued to follow Radloff for blocks as he walked to Union Station. Defendant shook the bike lock in his hand while continuing to curse at Radloff. As they walked west toward Union Station on the Madison Street bridge, Robert Jones testified that defendant was yelling at Radloff, stating, "look at my pants, mother f-----, [w]hat the f--- you gonna do about my pants." Defendant was yelling various obscenities at Radloff as they crossed the bridge, and according to witness Kheiri Gandi, defendant was very loud and appeared to be very angry. Witnesses testified that Radloff kept his head down as he walked and that he appeared to be nervous.

Eventually, defendant followed Radloff into Union Station. According to witnesses, when they reached the top of the steps leading into the train station, Radloff turned around, shook his head and appeared to make a gesture as if to say "no." Defendant subsequently "lunged" at Radloff and pushed him on the chest with both hands. According to witnesses, Radloff "flew" backwards down the set of stairs and landed headfirst on the concrete landing below. According to witnesses Brian Moore and Lyn Dudek, Radloff's legs "flew up from underneath him" and he was "airborne" before he landed on the back of his head at the bottom of the stairs. Moore testified that defendant stood at the top of the stairs pointing down at Radloff, screaming, "I told you mother f-----, come on, get up." According to witness Abana Tabb, before defendant pushed Radloff, he stated, "f--- you, mother f-----," "I'm gonna get you" and "I'm gonna scatter your brain." Dudek and witness Crystal Kenny-Perez also testified that just before he shoved Radloff down the stairs, defendant stated, "I'll splatter your mother f------ brains all over the street." According to witness Thomas Kuhn, when Radloff turned around at the top of the stairs, defendant stated, "just try to say anything, I dare you and if you do I'll nail you." Kuhn also testified that after Radloff landed on the concrete, defendant stated, "get up, you mother f-----." Defendant immediately fled the scene.

According to witnesses, Radloff was carrying a briefcase in one hand and a shoulder bag or laptop in the other hand. Radloff, who was 51 years old, was described as being approximately 6 feet 2 inches tall and weighed between 190 and 249 pounds. Defendant was ap-

proximately 5 feet 7 inches tall and weighed between 130 and 140 pounds. Defendant was 24 years old at the time of the offense.

Dr. Ronald Knoblock, a fellow in forensic pathology with the Cook County medical examiner's office, testified as an expert in the field of forensic pathology. Dr. Darinka Mileusnic performed the autopsy on Keith Radloff on December 17, 1999, and prepared a corresponding report containing her findings. Upon review of the report and Dr. Mileusnic's notes and diagrams, Dr. Knoblock testified that the autopsy revealed that Radloff suffered a skull fracture that extended from the base of his skull, across the midline of the skull, and over to the bone just beneath his eyes. Radloff suffered internal hemorrhaging and bruising to his brain, in addition to internal bleeding around his right kidney, the abdominal cavity and his left chest wall. The external examination revealed a bruise on Radloff's chest that was consistent with being forcefully pushed with the butt of a hand. According to Dr. Knoblock, in order to suffer this type of bruising underneath layers of winter clothing, the force would have to be great in order to break the blood vessels. Dr. Knoblock testified that Radloff's injuries were massive and would not have been survivable by many people. Both the report and Dr. Knoblock concluded that Radloff died of cranial cerebral injuries due to an assault and that the manner of death was homicide.

Following the close of the State's case, defendant rested without presenting any evidence.

Although the court instructed the jury on the lesser included offense of involuntary manslaughter, the jury convicted defendant of first degree murder.

At defendant's sentencing hearing the State entered into evidence certified copies of defendant's 1994 conviction for aggravated stalking, for which defendant received a two-year prison term, a 1995 conviction for intimidation, for which he received a two-year prison term, and a 1998 conviction for domestic battery, for which he received one year of conditional discharge.

In aggravation Tamieka Smith, defendant's former girlfriend, testified on behalf of the State. Smith testified that in 1998, when she came home, defendant was parked in his car down the street from her house. When Smith came outside, all of the windows to her car had been broken. The next day, as Smith was leaving her grandmother's house, defendant was parked outside. Defendant followed her, and when she stopped at a traffic light, defendant got out of his car, reached into her car and started punching her in the face. Following the attack, Smith obtained an order of protection against defendant.

Barbara Arnold, another former girlfriend, also testified on behalf

of the State. Arnold testified that in June 1994, she was watching television when she dropped the remote control onto the floor. When she reached down to pick it up, defendant was under the bed with handcuffs and a butcher knife. Defendant refused to leave and Arnold called the police, who arrested defendant when they arrived. Thereafter, in July 1994, Arnold woke up to find defendant standing over her with a gun. Defendant dragged her out of bed, punched her in the face, jumped on top of her and threatened to kill her. Despite an order of protection against defendant, he came to her house three times thereafter and threatened to kill her. On one occasion, defendant broke into Arnold's apartment, beat her, placed a knife against her face and threw Arnold's two-year-old son up against a wall. In October 1994, defendant again appeared at Arnold's apartment, broke her kitchen window and threatened to burn down the building.

In 1998, defendant was arrested for striking his aunt, Arnell Givens, and knocking her down onto the floor.

In mitigation, defendant's mother, Rhonda Givens, read a prepared statement in court. Defendant's mother stated that defendant is a decent man with a five-year-old son. Sylvia Davis, defendant's fourth- and fifth-grade library teacher, testified that defendant was a kind and obedient student and that he always helped her.

Erin Scott, a friend of defendant, also testified in mitigation. Scott described defendant as laid-back, a good listener and easy to talk to. Lastly, Officer Janie McConnell, a correctional officer with the Cook County department of corrections, testified that defendant, who was housed in her prison wing, was respectful and never gave her any problems.

In allocution, defendant stated that he was not a murderer. In addressing the Radloff family, defendant stated that "[the victim] didn't die in the manner that was theorized by the State. I would like you to know that. In the inventory of the Chicago Police Department there are two videos. In those videos, I think you deserve to know this, shows the actual crime that took place. I think you deserve to know the truth for closure for your family. This is something for you. I have remorse."

The trial court, stating that it considered all of the evidence in aggravation and mitigation, imposed a 60-year sentence. In mitigation, the court noted that defendant had significant family support, that he was employed at the time of the offense, and that his incarceration would cause a hardship on his mother and son. The court further acknowledged that defendant's incarceration would greatly interfere with his relationship with his son. The court, however, found that the evidence of guilt was "absolutely overwhelming" and that defendant's

life demonstrated an "escalating pattern of violence." The court further stated to defendant that it regarded it a "virtual certainty if you get out into the public again, you will run across something that makes you feel that you have been greatly wronged and you will react violently." The court then discussed the nature of the offense, pointing out that defendant followed the victim for an extended period of time and did not touch him until he reached the top of the stairs to the train station. Furthermore, the victim was twice as old as defendant and he was off-balance due to the laptop and briefcase he was carrying when defendant pushed him down the stairs. According to the court, defendant had not displayed an "iota of remorse" and his statements of remorse were not genuine.

In denying defendant's subsequent motion to reconsider his sentence, the court noted that a 60-year sentence was "somewhat unusual" in light of the absence of a weapon. However, the court again stated that when taking everything together, the sentence was absolutely appropriate.

On appeal, defendant does not challenge the evidence presented by the State. Rather, defendant contends that the evidence only proved that he acted recklessly because the State failed to establish that defendant intended to kill Radloff or that he knew that pushing him down the stairs would cause great bodily harm.

■ Contrary to defendant's contention that a *de novo* standard of review should apply, we review defendant's argument that the evidence supported a conviction for involuntary manslaughter rather than first degree murder as a challenge to the sufficiency of the evidence to sustain the verdict of the jury. *People v. Cook*, 352 Ill. App. 3d 108, 130 (2004). In reviewing a sufficiency of the evidence claim, the relevant question is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Evans*, 209 Ill. 2d 194, 211 (2004). It is the function of the trier of fact to assess the credibility of the witnesses, decide the weight to be given to their testimony, resolve any conflicts in the evidence, and to draw reasonable inferences from the evidence. *People v. Brooks*, 187 Ill. 2d 91, 132 (1999).

■ A person is guilty of first degree murder when he kills an individual without lawful justification if, in performing the acts, he intends to kill or do great bodily harm or knows that his acts created a strong probability of death or great bodily harm to that individual. 720 ILCS 5/9—1(a)(1), (a)(2) (West 1998).

Conversely, a person commits involuntary manslaughter if he unintentionally kills an individual without lawful justification if his

acts are likely to cause death or great bodily harm and his conduct is reckless such that it is likely to cause death or great bodily harm to the individual. 720 ILCS 5/9—3(a) (West 1998).

The state of mind for murder is knowledge, while the state of mind for involuntary manslaughter is recklessness. See *People v. Lee*, 256 Ill. App. 3d 856, 860 (1993). A person is said to have knowledge when he is consciously aware that his conduct is practically certain to cause a particular result. 720 ILCS 5/4—5(b) (West 1998). A person acts recklessly when he "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow *** and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." 720 ILCS 5/4—6 (West 1998). Recklessness therefore typically involves a lesser degree of risk than conduct that creates a strong probability of death or great bodily harm. *People v. DiVincenzo*, 183 Ill. 2d 239, 250 (1998).

In order to prove first degree murder, the State is not required to prove that defendant had a specific intent to kill or to do great bodily harm. *People v. Tenney*, 347 Ill. App. 3d 359, 366 (2004). Rather, it is sufficient to show that defendant willfully and voluntarily committed the act, the natural tendency of which was to destroy another's life. *People v. Howery*, 178 Ill. 2d 1, 43 (1997); *Tenney*, 347 Ill. App. 3d at 366-67. Intent may be implied from the character of the act. *Howery*, 178 Ill. 2d at 43. The question of whether defendant acted with the intent to kill or cause great bodily harm or merely acted recklessly is a question of fact for the jury, and its finding will not be disturbed on review unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt as to the defendant's guilt. *People v. Hall*, 194 Ill. 2d 305, 330 (2000); *Cook*, 352 Ill. App. 3d at 131.

 In the present case, we reject defendant's position that although he indicated a desire to take the life of Radloff, the action taken to attain that goal, *i.e.*, pushing Radloff down five stairs, was not done with the intention to kill him. The evidence established beyond a reasonable doubt that defendant committed first degree murder when he pushed Keith Radloff down five stairs onto a concrete landing in Union Station. Here, the circumstances leading up to Radloff's death from the fatal fall began on December 14, 1999, with an accidental collision between him and defendant on the Franklin Street bridge in Chicago and included defendant hitting Radloff in the head with a metal bike lock. Defendant's rage carried over to the following day when he threatened Radloff and followed him for blocks to Union Station. According to witnesses, defendant "harassed," "taunted" and "intimidated" Radloff with his words and body language. Defendant was so

loud that pedestrians across the street heard him yelling at Radloff. Upon reaching the top of a set of five stairs that led into Union Station, Radloff, for the first time, turned around to face defendant and shook his head and hand as if to say "no." According to Abana Tabb, Lyn Dudek and Crystal Kenny-Perez, defendant stated something to the effect of "I'm gonna splatter your mother f------ brains all over the street." At that point, defendant lunged at Radloff and pushed him down the stairs with both hands. Defendant pushed Radloff with such force that witnesses described him as being "airborne" and stated that he literally "flew" over the stairs before he landed, headfirst, onto the concrete. Radloff landed with such force that he suffered a skull fracture that started from the rear base of his head and extended around to the bone beneath his eyes. Notably, as the trial court pointed out, defendant followed Radloff for blocks without touching him. It was only after he reached the top of the stairs to Union Station and stated that he would "splatter" Radloff's brains that defendant shoved Radloff down the stairs with such force that he left bruises on Radloff's chest underneath layers of winter clothing. Based on the sum of this undisputed evidence, a rational jury could have concluded that the evidence was sufficient to prove defendant guilty of first degree murder beyond a reasonable doubt. It is undisputed that defendant willfully and voluntarily pushed Radloff, who was carrying a briefcase and a laptop, down the stairs onto the concrete landing below. A reasonable jury could conclude that the natural tendency of this act was to destroy Keith Radloff's life, and defendant knew it, especially given his statement just prior to the act.

Moreover, defendant's intent could be inferred based on the severity of Radloff's injuries. *People v. Reeves*, 228 Ill. App. 788, 799 (1992). Here, Dr. Knoblock testified that Radloff's injuries were so severe and massive that they would not have been survivable by many people. Defendant did not gently push Radloff to the side. Rather, he lunged at him at the top of a stairwell and hurled him in the only possible direction, down a flight of stairs onto a concrete landing. The jury here was instructed on first degree murder and involuntary manslaughter and could have convicted defendant of the lesser included offense. The jury, however, elected not to do so and this court is without authority to disturb the jury's verdict where, as here, the evidence was sufficient to support the verdict. *Cook*, 352 Ill. App. 3d at 131.

In reaching our conclusion, we have considered the cases cited by defendant; however, we find them distinguishable. First, in *People v. Crenshaw*, 298 Ill. 412 (1921), the defendant took the victim by the arm, turned him partially around and told him that he would kill him for two cents. The defendant then immediately struck the victim in

the face with a clenched fist, knocking the victim down to the ground. The victim died shortly thereafter. The supreme court reversed the defendant's murder conviction, explaining that the blow with the fist to the side of the face or head was not likely to be attended with dangerous or fatal consequences and that no inference of intent to kill was warranted from the circumstances of the case. *Crenshaw*, 298 Ill. at 416-17. Additionally, despite the defendant's statement, death was not a reasonable or probable consequence of a blow with the defendant's bare fist. *Crenshaw*, 298 Ill. at 417. Unlike the defendant's actions in *Crenshaw*, common sense dictates that defendant's actions here, which consisted of violently pushing a man backwards with full force from the top of a flight of stairs onto a concrete landing below, were likely to cause death or great bodily harm.

Furthermore, defendant's reliance on *People v. Cates*, 111 Ill. App. 3d 681 (1982), is misplaced. In *Cates*, the victim slipped and hit her head on the wall when the defendant pushed her away. The victim died as a result of her injuries. The issue on appeal was whether the defendant's conduct was reckless and, therefore, supported his involuntary manslaughter conviction. *Cates*, 111 Ill. App. 3d at 690. In affirming the defendant's conviction, the court held that the evidence was sufficient to establish that the defendant acted recklessly. *Cates*, 111 Ill. App. 3d at 690. *Cates* provides no support for defendant's assertion that the evidence in this case was insufficient to sustain his conviction for first degree murder.

Lastly, we agree with the State that defendant's reliance on *DiVincenzo* for the proposition that a court must consider (1) the disparity in size and strength between the defendant and the victim, (2) the brutality and duration of the beating, and (3) whether the defendant used his bare fists or a weapon to determine whether a defendant has acted recklessly is misplaced. In *DiVincenzo*, the issue on appeal was whether the defendant, who had been convicted of first degree murder, was entitled to a jury instruction on involuntary manslaughter. The supreme court held that the aforementioned factors could be considered in determining whether the defendant acted recklessly and "whether an involuntary manslaughter instruction is appropriate." *DiVincenzo*, 183 Ill. 2d at 251. Here, the jury was instructed as to involuntary manslaughter. Accordingly, his reliance on *DiVincenzo* is misplaced.

■ Next, defendant contends that his sentence is excessive in light of substantial mitigating factors, including his positive employment record, supportive family and strong potential for rehabilitation.

A trial court's sentencing determination is entitled to great deference. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). The trial court is

generally in a better position to determine a sentence because the court has the opportunity to balance relevant factors, including the acts constituting the crime and the defendant's credibility, demeanor, general moral character, habits, social environment and age. *Stacey*, 193 Ill. 2d at 209. In fashioning an appropriate sentence, the trial court must look to the particular circumstances of each case (*People v. Dinwiddie*, 299 Ill. App. 3d 636, 646 (1998)), and absent an abuse of discretion, a reviewing court will not disturb a trial court's decision to impose a sentence that is within the proper sentencing range (*Stacey*, 193 Ill. 2d at 209-10). A sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit of the law or manifestly disproportionate to the nature of the offense. *People v. Fern*, 189 Ill. 2d 48, 54 (1999).

We find that defendant has failed to demonstrate that the trial court abused its discretion in fashioning his sentence. First, while defendant received the maximum sentence allowable under the law, his sentence is still within the applicable 20-year to 60-year sentencing range for first degree murder. See 730 ILCS 5/5—8—1(a)(1)(a) (West 2002). Next, it is presumed that the trial court considered all of the factors presented in mitigation, especially where it specifically stated that it did so. See *People v. Benford*, 349 Ill. App. 3d 721, 736 (2004). Here, the record clearly indicates that the trial court specifically considered the mitigating factors defendant now addresses on appeal. Before imposing its sentence, the trial court discussed defendant's family support, his employment record and the hardship his family would endure as a result of his incarceration. However, weighing these factors against the "absolutely overwhelming" evidence of guilt and severity of the crime (*People v. Blackwell*, 325 Ill. App. 3d 354, 361 (2001)), the court determined that a lengthy sentence was necessary to protect the public.

The seriousness of the crime has been recognized as the most significant factor to be considered in sentencing. *Dinwiddie*, 299 Ill. App. 3d at 646. Here, defendant was convicted of first degree murder of a commuter who was walking to the train station to go home at the end of the workday. The court specifically found that defendant's life, which included prior convictions for three violent offenses, demonstrated an "escalating pattern of violence" and that it would be a "virtual certainty" that defendant would commit another act of violence should he be "wronged" again in the future. The court also weighed the mitigating factors against the fact that defendant had been previously incarcerated and that he displayed not even an "iota of remorse" for his actions in the present case. After balancing all of these factors, the court determined that a 60-year sentence was war-

ranted. Furthermore, in denying defendant's motion to reconsider his sentence, the court acknowledged that the maximum sentence was "somewhat unusual" given that no weapon was used. However, the court, taking everything into consideration, determined that such a sentence was "absolutely appropriate." Based on this record, we find that defendant has failed to establish that the court abused its discretion.

For all of the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

WOLFSON and GARCIA, JJ., concur.