2021 IL App (2d) 180110-U
No. 2-18-0110
Order filed May 18, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 07-CF-1842 |
| QUENTIN MOORE | ) ) | Honorable Linda Abrahamson |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Zenoff and Brennan concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Accomplice testimony presented at defendant's discharge hearing was sufficient to sustain a finding of "not not guilty" of first-degree murder beyond a reasonable doubt.

¶ 2   Defendant Quentin Moore appeals the trial court's determination that he is "not not guilty" of first-degree murder after conducting a discharge hearing pursuant to section 104-25 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/104-25 (West 2018)). On appeal, defendant argues that the accomplice testimony presented by the State was insufficient to support such a finding. We affirm.

¶ 3                                          I. BACKGROUND

¶ 4      On June 29, 2007, defendant was charged with six counts of first-degree murder (720 ILCS 5/9-1 (West 2004)) as a result of the September 4, 2005, killing of George Caro. At that time, defendant was already serving a sentence for attempted murder in an unrelated case, 05-CF-2900. On March 11, 2016, after considering relevant medical reports, a report issued from the Department of Corrections, and its own observations of defendant's behavior, the trial court entered an order finding defendant unfit to stand trial pursuant to sections 104-16 and 104-17 of the Code (725 ILCS 5/104-16, 104-17 (West 2016)) and remanded him to the Department of Human Services. In addition to the instant matter, this order pertained to several other cases in which defendant was named as a defendant, including 08-CF-1462 (aggravated battery and mob action) and 10-CF-1477 (aggravated battery).[1] On June 8, 2017, the trial court entered an order finding that defendant remained unfit for trial. At that time, the State requested a discharge hearing.

¶ 5      On October 2, 2017, defendant's discharge hearing commenced. Officer Todd Fancsali testified that on September 4, 2005, he was working for the Aurora Police Department when he received a radio dispatch regarding "a suspicious subject lying in a yard" abutting 660 North Lincoln Avenue. He arrived at the yard at approximately 4:17 a.m., where he found a shirtless male "laying [*sic*] on the ground on his back, wearing shorts, [and] white socks." Officer Chad Kubis arrived at the scene shortly after Fancsali and checked the body for vital signs while Fancsali

---

[1] While not listed on the described order, the transcript from defendant's fitness hearing also invokes 07-CF-1826 (first degree murder). The transcript also identifies 07-CF-1840, but the record indicates that this case was *nolle prossed* and closed as of November 2008.

called for paramedics. Fancsali concluded that the male was deceased and called for a sergeant to attend the scene.

¶ 6 Officer Chad Kubis testified that, after receiving a call regarding a "suspicious person," he arrived at the crime scene shortly after Officer Fancsali. There, he noticed "a person laying [*sic*] on the ground." Kubis was unable to detect any vital signs from the body and noted that the body was not wearing a shirt or shoes. He recognized the deceased person as George Caro, whom he had become acquainted with during his time in Aurora's gang unit.

¶ 7 Timothy Echols testified that he was currently serving a 45-year sentence within the Illinois Department of Corrections after having been convicted of murder. The sentence was part of a plea agreement in which Echols agreed to "testify truthfully about the events and people involved in the killing of George Caro." In exchange for testifying, Echols was not charged in the murder of Caro. Furthermore, while there was a "separate murder" that was "pending in adult court," the "State's Attorney [would] dismiss the remaining murder" once Echols's "testimony [was] complete."[2]

¶ 8 Echols testified that while he was no longer affiliated with the Latin Kings, he had previously been a member, having first joined the gang in 2003. When asked how he came to be a member of the gang, he answered, "Just hanging around my cousins, family." Echols described the hierarchy of the gang, testifying that when an individual is a "full-fledged member of the gang," it means "[t]hey got their crown." To first get "their crown," a prospective member must "have put in work" by becoming involved with "crimes, murder, attempt[ed] murder." Affiliates with the

---

[2] The State did not delve into the specifics of this "separate murder" while questioning Echols, but it seems to be unrelated to the killing of George Caro.

gang who had not yet received their crowns were referred to as "shorties." Echols received his crown after committing a murder.

¶ 9 Echols testified that the leader of the Latin Kings was referred to as an "Inca," and that defendant was the Inca of the Aurora Latin Kings in September 2005. According to Echols, Incas had the authority to "give orders" to subordinate members of the gang, just as full-fledged members of the gang had authority to give orders to "shorties."

¶ 10 After affirming that he had reviewed "a copy of a transcript of [his] prior testimony,"[3] Echols testified about the events leading up to Caro's killing. On September 3, 2005, when Echols was 14 years old, Caro visited him at his mother's house. The two "hung out on [Echols's] porch, drinking, [and] doing some [cocaine]." After about an hour, they left to go to Anna Ortiz's house "[t]o hang out, [and] party a little bit." While there, Echols and Caro "[h]ung out, [and] did some more [cocaine]." Several partygoers trickled in and out of Ortiz's house before Ruben Hernandez, Max Aguilar, defendant, Juan Vargas, and Roman Lucio arrived. Echols recognized all five of these men as Latin Kings.

¶ 11 After arriving, Juan Vargas—who Echols only knew as "Shorty"[4]—confronted Echols about being high on cocaine, as it was "against the rules of the Latin Kings to be high on cocaine." Breaking this rule would subject one to a "violation," a beating inflicted by a full-fledged Latin

---

[3] The State did not mention any specifics regarding this "prior testimony" while questioning Echols, but based on its subject matter, it presumably came from Juan Vargas's 2012 trial for the killing of Caro.

[4] While the term "shorty" could refer to a Latin King affiliate who did not receive his crown, it was also Vargas's nickname and did not reflect his status in the gang.

King against a victim who must "[s]tand there and take it." Fearing reprisal, Echols denied being on cocaine and greeted the remaining four gang members with a specific gang handshake, which Latin Kings refer to as "[s]haking up." In order to complete this handshake, two Latin Kings would interlock their hands in a specific way, so as to form a crown. According to the Latin King's rules, only those who had their "crowns" could initiate a "shake up" with other members who had their "crowns." Otherwise, the member initiating a "shake up" with a full-fledged member would be subject to a "violation."

¶ 12    After Echols "shook up" with the remaining Latin Kings, Caro also "shook up" with them. Afterwards, someone accused Caro of "shaking up" with the Latin Kings while not having his crown, prompting Hernandez and defendant to have a discussion on the matter. Afterwards, the two told Caro that "he had a violation," and Caro "just accepted it." While some women remained drinking inside of Ortiz's home, the men exited a side door, followed by Echols. Aguilar told Echols that the two had to "post up," meaning they had to "be on security" as lookouts. Echols walked towards the sidewalk in front of Ortiz's home. It was already late, "sometime after midnight," and Echols did not see any witnesses in the area. While he remained posted on the sidewalk, Echols saw the rest of the group head towards the neighboring house's backyard. Echols then saw the men "[come] up from the side of *** one of the neighbor's houses, and [stop] on the sidewalk." They stopped on the sidewalk "a house or two down the street."

¶ 13    After the group reappeared down the street, Echols saw Hernandez, defendant, Vargas, and Lucio all begin to punch Caro at once. The men hit Caro "all over" his body and head with closed fists. Eventually, Caro ended up falling to the ground because "[s]omebody pulled him down." The Latin Kings then "started stomping on him." Hernandez, defendant, Vargas, and Lucio all "participated in the punches and the kicks." Caro did not attempt to defend himself or run. Echols

testified that neither he nor Aguilar personally participated in the beating, which lasted "[o]ver two minutes," but "less than ten minutes." At some point, Vargas began to use "a bat or a stick" to hit Caro, "like one of those mini bats" one might get as a souvenir during a baseball game. However, Echols wasn't positive whether the weapon was a bat or "some other stick-like object." Echols could hear the men as they beat Caro; the beating sounded like "smashing a pumpkin." At some point during the beating, Anna Ortiz left her house to ask Echols about what was going on outside. Echols told her that the Latin Kings were "givin' a violation" before advising her to go back inside.

¶ 14    After beating Caro, Hernandez, defendant, Vargas, and Lucio picked Caro up, and carried him "[t]o the side of a house," towards a side yard. The men then reappeared without Caro. Aguilar joined Hernandez, defendant, Vargas, and Lucio as they entered Lucio's van and left the scene. Echols returned inside Ortiz's home and asked one of the partygoers for a ride home. Once home, Echols used "some more drugs, [specifically] cocaine."

¶ 15    At some point "later on the day" of September 4, 2005, a member of the Aurora Police Department visited Echols at his home. Echols lied to the police officer, telling her that he "didn't know anything about what happened to [Caro]" and that "[Caro] never got dropped off" at Echols's home. When the State asked whether Echols gave "the police officer any other names," Caro replied that he had mentioned the name "Juan," because "it sounded like a decent name to give him." Echols testified that he did not mean to implicate Juan Vargas, because at the time he had only known him as "Shorty."

¶ 16    Later in the day, Echols visited defendant at his home to inform him that the police had spoken with him earlier. When speaking with defendant, Echols "told him that they found [Caro's] body, [and] that he was dead." Defendant asked Echols whether he had said anything to police. Because it was a "violation of the rules of the Latin Kings" for any member to speak with police,

Echols lied and told defendant that he hadn't said anything.[5] Afterwards, defendant told Echols that after leaving Ortiz's house the night before, the Latin Kings had "got[ten] rid of their shoes, burned their shoes." Echols left defendant's home.

¶ 17    On cross-examination, defendant questioned Echols about the specific ways in which a prospective member of the Latin Kings could receive their "crown." Defendant asked, "[S]o you don't have to kill somebody in order to get a crown. You can just do a crime of violence, beat 'em up or something like that?" Echols answered, "Yes." Defendant then pointed out that in May 2012, when Echols testified in Juan Vargas's trial for Caro's murder, Echols was asked "to explain to the ladies and gentlemen of the jury what a crown is[.]" At that time, Echols responded, "To kill somebody." Echols acknowledged his prior response but specified that his answer may not have been "put the right way." He further explained that killing someone is only "one of the ways of getting your crown."

¶ 18    Defendant then sought to impeach Echols's testimony concerning his introduction to the Latin Kings. Defendant asked Echols whether he had previously indicated that he first met the Latin Kings "[t]hrough friends, through friends at school." Echols answered, "Yes, that's another thing, another way." Defendant pointed out that this prior testimony conflicted with Echols's more recent statements, in which he stated that he had "met the Latin Kings through family members." Echols acknowledged the inconsistency.

¶ 19    Defendant asked Echols, "It's your testimony today, by the way, that—that you saw, I think you said it was [Vargas] use a stick or a bat to strike the victim, George Caro, in this case, correct?"

---

[5] Echols later testified that he had in fact received a beating for having spoken with the police on September 4, 2005.

After Echols agreed, defendant asked whether Echols recalled discussing Caro's murder with a detective at the Du Page County Youth Home in January 2006. Echols indicated that he remembered giving the detective a statement at that time. Defendant then asked, "And in the entire statement, you never once mentioned anything about a stick or a bat, correct?" Echols could not recall, so defendant showed him a copy of his former statement to refresh his memory. Upon seeing the statement, Echols agreed that there was "[n]othing about a bat or stick in [it]." Reading from the transcript of Vargas's earlier murder trial, defendant then asked Echols about several questions that were reportedly asked of him at that time. Defendant read the following from the Vargas trial transcript:

> "[Question]: [']Did you see whether or not a weapon was used to hit George Caro?'
>
> Answer: 'No.'
>
> Next question: 'Did you see if a weapon was present?'
>
> Answer: 'No.'
>
> [Next question]: 'Did you see anybody go to the van?'
>
> Answer: 'No.'
>
> [Next question:] 'Did the beating end?'
>
> Answer: 'No.' "

Echols confirmed the transcript's accuracy but surmised that he "wasn't in [his] right mind-set" when he previously answered the questions. Echols added that "[he] probably wasn't thinking clearly. It was a long time ago. Some things just go away and come back."

¶ 20    Turning back to the evening of September 3, 2005, defendant asked Echols, "How much alcohol did you have to drink that evening?" Echols responded, "It had to be no more than three beers." Defendant asked how much cocaine Echols ingested that evening, leading Echols to

respond, "[A]bout $50 worth," which was enough for him to get high. Echols reiterated that he had used more drugs after returning home after the party.

¶ 21    Defendant asked whether Echols had previously told the same detective that Lucio was the Latin King's Inca at the time of the murder, in contradiction to his earlier testimony in which Echols implicated defendant as the gang's leader. Echols agreed. Echols similarly acknowledged never testifying that defendant was the gang's "Inca" at Vargas's murder trial but stated that he was "not sure if [he] was asked that."

¶ 22    Noting that Echols's plea deal required him to "give testimony against anybody who [was] involved in the murder of George Caro," defendant asked Echols whether it was true that he had not always "honored [his] end of the bargain." Echols acknowledged that he refused to testify in Hernandez's and Aguilar's 2008 trial for their roles in the Caro murder. Echols also acknowledged that, while the judge in that case warned him that he would lose his plea deal as a result of his refusal, he ultimately received "no sanction whatsoever" for failing to testify.

¶ 23    On redirect examination, the State first questioned Echols about his testimony from Vargas's trial, in which he initially denied having seen a bat or other weapon used to beat Caro. The State elicited testimony establishing that later in his testimony in that trial, Echols had acknowledged that he had in fact seen a baseball bat or other stick-like weapon that was used to strike Caro. Echols also acknowledged admitting this fact both to prosecutors and his own attorney before Vargas's trial took place.

¶ 24    Officer Guillermo Trujillo testified that in September 2005, he was employed in the investigations unit of the Aurora Police Department and took part in the investigation of Caro's murder. As part of these duties, he and two other officers arranged three line-ups as part of their investigation against defendant, Hernandez, and Vargas, who were all suspects in the murder. In

each of their separate line-ups, Echols identified defendant, Hernandez, and Vargas as being involved in Caro's beating. On cross-examination, defendant asked Trujillo whether he was aware of if Echols was "trying to get himself some kind of a plea deal" by participating in the line-ups, but Trujillo "[had] no recollection of that."

¶ 25 Roman Lucio testified that he was currently serving a 20-year sentence at the United States Prison System in Terre Haute since November 1, 2006, after he pleaded guilty to "multiple counts of drugs and drug conspiracies." Once Lucio was taken into federal custody, he entered "into an agreement to cooperate" with the State, presumably with regards to the investigations surrounding various State offenses, including Caro's murder. He also pleaded guilty in two separate cases for "conspiracy to commit murder" as part of his plea deal and was sentenced to 26 years' incarceration in the Illinois Department of Corrections for each of these offenses. One of these cases involved the shooting of John Suarez; the other involved the beating death of Caro. As part of Lucio's deal, he would not be charged with murder for either killing and his state sentences— which were to be served at 50%—were to be served concurrently with his federal sentence.

¶ 26 Lucio testified that he had first become affiliated with the Latin Kings at an early age, when he was "probably in between 10 and 12 years old," and remained a Latin King until at least November 2006, when he was incarcerated. Lucio then gave his version of the Latin King's hierarchy. Like Echols, he described how the leader of the Latin Kings in Aurora was referred to as "[t]he Inca." The second in command was referred to as "Cacique," followed by the chairman of the "Chapter Crown Council," which was composed of "[b]etween five and seven" members. Each chapter of the Latin Kings had their own crown council. Below the chairman, the next in the gang's hierarchy was the gang's treasurer, followed by a position called the "Enforcer." During his tenure as a Latin King, Lucio held positions as chairman of the Chapter Crown Council,

"Enforcer," and "Inca." In contrast to Echols's earlier testimony, Lucio testified that he was the gang's "Inca" in 2005, although defendant had also been a candidate for the position at that time. After Lucio was chosen as the gang's "Inca," defendant was chosen to be the gang's "Cacique."

¶ 27     Lucio described the events that took place during the evening of September 3, 2005. Before arriving at Anna Ortiz's party, he, Aguilar, Vargas, Hernandez, and defendant were at Jose Lozano's house. In contrast to Echols's earlier testimony, Lucio testified that Echols was also with the Latin Kings at Lozano's house before Lucio used his SUV to drive the men to Ortiz's party. There, he saw Caro in Ortiz's living room. After walking into the room, Lucio "shook up" with Caro and asked what his name was and where he was from. Caro told him he was from "Thirty-Third," which was a chapter of the Latin Kings located in Chicago.

¶ 28     Later that night, Echols approached Lucio to tell him that Caro wanted to "holler" at him, meaning he wanted to speak with Lucio. During the ensuing conversation, Caro was "portraying to be some Latin King" and asked if Lucio wanted to "borrow some guns from him." After this, Lucio entered Ortiz's bathroom, where he found Aguilar, Vargas, Hernandez, and Defendant, who were "already plotting before [he] went inside." The four Latin Kings were listening in on Lucio's conversation with Caro. The men told him that Caro was spreading rumors about him, specifically that Lucio "got [his] ass whooped by White Folks[6] in the county [jail]." Lucio told them that he wished to speak to Caro outside. Defendant peeked out of the bathroom to look at Caro, and said, "I know a trick when I see a trick." A "trick" was someone who was known to speak with police. Before leaving the bathroom, Lucio—who had already been drinking that night—smoked marijuana with Aguilar. After reentering the living room, Lucio and defendant stared down Caro.

_____

[6] According to Lucio, "White Folks" was another individual's nickname.

¶ 29　Lucio, Vargas, and Aguilar left the house. Once they were outside, Lucio told Aguilar that he wanted to question Caro about "running [his] name through the dirt." Lucio planned on fighting Caro if it were true that Caro was spreading rumors about him. Lucio continued smoking marijuana. Before Aguilar was able to go inside to get Caro, Caro already left the house with Echols, Hernandez, and defendant. The men all walked away from Ortiz's house, heading south on the sidewalk. While they were walking, Lucio grabbed Caro, put his arm around Caro's neck and asked whether he had been spreading rumors about him getting beat up while in county jail. Caro told Lucio that he wanted to become "A-Town," meaning that he wanted to join the Aurora Latin Kings. At this point, Lucio didn't know whether Caro was already "a King or not right there," as required to be transferred to the Aurora chapter of the gang. Lucio relayed the request to Hernandez, who held a position as the gang's "Enforcer," requiring him to question Caro pursuant to the request.

¶ 30　Before the men had an opportunity to question Caro, he answered an incoming phone call from his sister. While Caro spoke with his sister, the other men spoke about giving Caro a violation. After speaking with his sister, Caro eventually accepted the violation. After taking a vote, Lucio, defendant, Echols, Hernandez, and Vargas decided that the violation should last one minute. Hernandez volunteered to keep track of the time, and defendant struck Caro. Vargas was crouched down behind Caro, causing Caro to immediately fall. Echols and Aguilar acted as lookouts while the rest of the men punched and kicked Caro. Somebody told Lucio to stop hitting Caro, and Lucio saw Caro lying on the ground, attempting to protect his face. He got up once more, "and then he got put down again." Lucio could tell a minute had passed, but Hernandez failed to announce as much. Lucio told the other men to stop hitting Caro, and after some more moments, they did.

¶ 31    Caro was "laid out." Lucio touched his arm in order to see if he could detect a pulse. Caro was silent. Lucio then touched his neck to see if he could feel Caro's pulse. Lucio told the others that Caro was alive, "but that he wasn't looking too good." Vargas removed Caro's shirt, another gang member took his shoes, and Echols took Caro's phone. Later, Hernandez removed Caro's necklace. Hernandez, Aguilar, and Lucio carried Caro to the back of a neighboring house, before he was eventually moved to the house's side yard.

¶ 32    Lucio told defendant that he wanted to take Caro to the hospital, although he acknowledged that Caro was most likely beyond saving at that point. Defendant "didn't want to listen" to Lucio. Defendant told Vargas to bring him a bat because he was "going to show him how it was done." Vargas went into Lucio's SUV and retrieved a short, wooden bat before handing it to defendant. Defendant stood over Caro, and Lucio turned away once he saw defendant swing the bat, because he "didn't want to see that." He heard the bat hit Caro's body "about four times." Defendant returned the bat to Vargas, who attempted to give it back to Lucio. Lucio removed the grip from the bat but refused to take the bat back. Vargas volunteered to keep it. Lucio testified that the men—including Echols—returned to his SUV and left. Lucio dropped off Hernandez and Aguilar within walking distance of their homes before dropping off Echols and defendant at Echols's home. Lucio returned to his father's home afterwards. Lucio reported never having seen Caro's personal items or the bat ever again.

¶ 33    On cross-examination, defendant asked Lucio whether all full-fledged members of the Latin Kings needed to know who their Inca was. In response, Lucio indicated that full-fledged members "could know if they want to." Defendant then asked whether it was "clear to [Lucio] that Mr. Echols knew that [Lucio was] in charge, that [he was] the Inca[.]" Lucio responded, "He knew that I was the Inca."

¶ 34    Defendant asked Lucio about the previous trials that he had testified in—specifically those of Aguilar, Hernandez, and Vargas. Defendant asked whether it was Lucio's position that defendant was the first gang member to have struck Caro. Lucio responded, "That's correct." Referring to Aguilar's and Hernandez's 2008 trial for their roles in Caro's killing, the following exchange occurred:

"DEFENDANT: Were you asked these questions and did you give these answers:

[Question]: [']Now, so there is a discussion about a violation, and then what happened?'

Answer: 'Shorty got behind him.'

***

'Then what happened?' You were asked. And your answer was: '[Hernandez] punched him,' right?"

Lucio responded that he could not remember what he had said, but that he was sure that defendant was the first one to strike Caro. He continued, "If I made a mistake or confused something, that's all it was. I was not lying." Defendant then read portions of Lucio's testimony from Vargas's trial, in which Lucio again claimed that Hernandez was the first to strike Caro. Again, Lucio indicated that he could remember testifying to that fact.

¶ 35    Investigator Jeff Hahn was accepted as a gang expert before testifying that the Latin Kings were a major gang in Aurora during 2005. Hahn described the hierarchy of the gang:

"[It is] [k]ind of structured as you would see a corporate structure. Number one, the term is called an Inca, which would be like the president. Their number two is called the Cacique, which would be your vice-president, and it kind of flows down. You have an

Enforcer, Secretary, Treasurer, and so on; falls all the way down to your Shorties or your street soldiers, which would be your gang members."

Hahn later specified that "shorties" were members who had not yet received their crowns. Hahn also confirmed the existence of the Latin King's Crown Council, which includes a chairperson and five other members. The Crown Council acts as "an oversight committee" for the gang. Hahn also described the concept of "violations," opining that "[c]ooperating with the police during an investigation" was "pretty much ruled as the number one no-no" within the gang. He also demonstrated the Latin King's hand signs and "shake up." Hahn went on to describe how Latin Kings "get their crown[s]" typically by committing "an act of violence," which did not have to cause another's death. Hahn also described "violations," and confirmed that Latin Kings who "shook up" without first receiving their crown would typically receive "violations."

¶ 36 In 2005, Hahn was aware that Lucio was the gang's "Inca," that defendant was the gang's "Cacique," and that Hernandez was the gang's "Enforcer." He noted that Vargas, Echols, and Aguilar were also affiliated with the Latin Kings in 2005. Hahn indicated that while Caro was a member of the Latin Kings, he was not active in the gang in 2005. Caro had previously been affiliated with one of the Latin King's Chicago chapters, "in the area of Thirty-Third and Morgan."

¶ 37 The parties stipulated that if Dr. Larry Blum were to have testified, he would testify consistently with a transcript introduced by the State, in which he previously described opinions he made pursuant to Caro's autopsy.[7] In the transcript, Dr. Blum described approximately 22

---

[7] While there is no date on the State's transcript, the transcript was presumably made during either Vargas's or Hernandez's and Aguilar's trial for Caro's murder. The autopsy described in the transcript was actually performed by Dr. Bryan Mitchell, who passed away prior to defendant's

"blunt force trauma-type injuries" that Caro had suffered, including "a number of contusions, abrasions, and lacerations noted primarily to [Caro's] head region." Caro also suffered similar types of blunt force trauma "to the trunk, hands, wrist—wrists and arms." Caro showed signs of a "picket-fence pattern" and a "chevron-type pattern" on his face, which was consistent with "the shoe or boot or something with a repeating pattern on it." These injuries were presumed to have been caused by a stomping motion. Caro also had other injuries and marks on his face that evidenced his being struck with a baseball bat, as well as other various bruises and defensive wounds on other portions of his body. Numerous wounds were consistent with "the use of the knuckles to strike the victim."

¶ 38    Dr. Blum's prior testimony also described Caro's various internal injuries. Caro's "primary injuries were in the head area, beneath the scalp." Caro's brain was "swollen or edematous and bloody." When asked whether "any one single injury that was internal to the head" would have caused death, Dr. Blum answered, "In this particular case, it was the multiplicity, the multiple blows that led to the death." Dr. Blum opined that Caro did not die instantly. He also reasoned that, based on his examination, "force was applied to [Caro's] head for—from multiple directions." Caro's toxicology results suggested that he had ingested marijuana, cocaine, and alcohol prior to his death, but these compounds had no connection with his death. In sum, Blum concluded that "Mr. Caro died of multiple blunt force head trauma."

¶ 39    The parties also stipulated that, if Aurora Police Evidence Technician Armando Montemayor were to testify, he would testify consistently with another transcript introduced by

---

hearing. Dr. Blum reviewed Mitchell's autopsy report, as well as the coroner's investigative report, autopsy photographs, and various transcripts in forming his opinions.

the State.[8] In that transcript, Montemayor described arriving to the scene of Caro's murder, where he found an area of blood "on the floor or parkway," as well as Caro's identification card, which was "found on the sidewalk just in front of 616 North Lincoln." Montemayor photographed Caro's body and confirmed that Caro only "had a pair of jeans shorts on and a pair of socks" when he was discovered.

¶ 40    The State rested. Defendant then offered several stipulations, before also resting his case. Defendant never testified at the hearing. After the parties gave their closing arguments, the court rendered its decision. In it, the court noted the credibility concerns raised by Echols's and Lucio's testimony:

> "I know that [Echols and Lucio] had both made deals with the government regarding their role in this incident. They both have other significant history of violence and murder beyond this case. But also, as Latin Kings, they do face significant personal risk by their testimony in this case."

Next, the court listed several consistencies between Echols's and Lucio's testimonies:

> "There are points of intersection in their testimony. Namely, that Echols was a lookout. That Lucio was involved in the bearing. And based on that, they literally had different viewpoints or vantage points. Echols down at the corner and Lucio involved in the beating.
>
> However, much of what they testify to is in fact corroborated by the physical evidence. Namely, that the fight began or the beating began on the parkway. Bloods [*sic*]

---

[8] Again, Montemayor's previous testimony is undated, but we infer that the officer testified at one of the previous two trials resulting from Caro's killing.

was found there. That the victim was moved to the location where he was—his body was ultimately recovered. That the victim was punched with hands and fists, he was kicked and stomped on with feet, and that he was hit with a bat or bat-like object, and that the victim's shoes and shirt were taken. Those are all corroborated by the physical evidence."

¶ 41 The court then discussed some of the inconsistencies between Echols's and Lucio's testimony, which it found "less relevant *** to the ultimate decision," such as the conflicting testimonies of how the Latin Kings "all got to and from [Ortiz's] house and who threw the first punch." The court conceded that "the motive of this incident is unclear," as the murder could have been the result of Caro's purported gossip about Lucio, or Caro's unauthorized handshake with the other Latin Kings. However, either conflicting theory suggested that "[Caro] wanted to be A-Town" and that the Latin Kings "voted to do a violation and that [Caro] accepted the violation." The court recognized that both Echols and Lucio testified that "[t]he violation was administered by [Hernandez], [Lucio], [Vargas] and defendant. All four at once who were hitting the victim with their hands and their fists. They were stomping on him with their feet." While it was unclear who exactly used the bat during the beating, "either [Vargas] and/or this defendant used the bat or stick to hit the defendant in the head. It made a sound like a smashing pumpkin and that is consistent with the medical examiner's report." Despite the inconsistencies in Echols's and Lucio's testimony, the court concluded that "the relevant points of intersection of their testimony is corroborated by the physical evidence."

¶ 42 The court entered acquittals on counts one (intentional murder) and three (knowing acts would cause death), but entered a finding of "not not guilty" as to count two (intent to do great bodily harm), count four (knowing strong probability of death), count five (knowing strong

probability of great bodily harm), and count six (felony murder). Defendant filed a motion for a new discharge hearing, but the court denied his motion. Defendant timely appealed.

¶ 43                                           II. ANALYSIS

¶ 44    On appeal, defendant argues that the State failed to prove that defendant was involved in the beating death of George Caro beyond a reasonable doubt. Specifically, defendant argues that Echols's and Lucio's testimonies were so inconsistent and unbelievable that they could not have established defendant's guilt beyond a reasonable doubt. Defendant also argues that the court's finding of "not not guilty" should be reversed because no physical evidence linked defendant to Caro's death. We address these arguments in turn.

¶ 45    "It is well settled that the due process clause of the fourteenth amendment (U.S. Const., amend. XIV) bars the criminal prosecution of a defendant who is not competent to stand trial. *People v. Waid*, 221 Ill. 2d 464, 470 (2006) (citing *Medina v. California*, 505 U.S. 437, 439 (1992)). Once a defendant has been found unfit, the court should conduct a discharge hearing in order to determine whether to enter a judgment of acquittal. *People v. Olsson*, 2011 IL App (2d) 091351, ¶ 4. This hearing is not a criminal prosecution and is not designed to determine guilt. *Id.* Instead, the question of a defendant's guilt should be deferred "until the defendant is fit to stand trial." *Id.* (citing *Waid*, 221 Ill.2d at 471). Therefore, an unfit defendant will not be convicted of his or her crimes even if the evidence at the discharge hearing sufficiently establishes the defendant's guilt. *Id.* In this situation, the defendant should instead be found to be "not not guilty." *Id.* (citing *Waid*, 221 Ill. 2d at 478). " 'Although a court's determination at a discharge hearing that the State has proved the defendant's guilt beyond a reasonable doubt does not constitute a technical determination of guilt, the standard of proof is the same as that required for a criminal

conviction.' " *People v. Peterson*, 404 Ill. App. 3d 145, 150 (2010) (quoting *People v. Williams*, 312 Ill. App. 3d 232, 234).

¶ 46    When a reviewing court is presented with a defendant's challenge to the sufficiency of the evidence, that court should not seek to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Rather, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "This standard of review does not allow the reviewing court to substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009).

¶ 47    Here, despite the various weaknesses in both Echols's and Lucio's testimonies, as well as the lack of any physical evidence specifically tying defendant to Caro's murder, we find that a rational trier of fact could have found defendant "not not guilty" beyond a reasonable doubt.

¶ 48                                    A. Echols's Testimony

¶ 49    First, when taken in the light most favorable to the State, Echols's testimony reasonably supported a finding that defendant was "not not guilty" of Caro's murder. "A conviction shall not be reversed simply because the defendant claims a witness is not credible." *People v. Tenney*, 347 Ill. App. 3d 359, 366 (2004). Regardless, accomplice testimony should be "cautiously scrutinized" upon appeal. *Id.* Accomplice testimony may sustain a criminal conviction where a trier of fact was apprised of any weaknesses in the testimony and nonetheless was convinced of a defendant's guilt beyond a reasonable doubt. *Id.* These weaknesses may include malice towards the accused, lenient plea deals, or even the lack of corroborating evidence. *People v. Wollenberg*, 37 Ill. 2d 480, 484 (1967). These standards apply whether a jury or a judge have found a defendant to be "not not

guilty." See *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007) (finding that the same standards apply when determining the sufficiency of the evidence in either a bench or jury trial) (citing *People v. Cooper*, 194 Ill.2d 419, 431 (2000)). However, while the fact finder's decision to accept testimony is entitled to great deference, it "is not conclusive and does not bind the reviewing court." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

¶ 50    Here, we find that the record contained ample evidence justifying the court's reliance on Echols's testimony. As the court correctly pointed out, much of Echols's testimony was corroborated by other evidence adduced at defendant's discharge hearing. For instance, Echols testified that he and Caro drank alcohol and used cocaine prior to Caro's death. This was corroborated by Dr. Blum's stipulated testimony, in which he described how Caro's toxicology report indicated the presence of these compounds. Echols's testimony concerning the location of Caro's beating was corroborated by Montemayor's discovery of a patch of blood on the sidewalk near 616 North Lincoln. Echols testified that defendant and the other Latin Kings moved Caro's body to a nearby "side yard" after beating him; this was corroborated by the testimony of Officer Fancsali, Officer Kubis, and Montemayor, who all located Caro's body as part of their investigation. Echols's testimony of these locations was also consistent with Lucio's testimony on the subject.

¶ 51    Much of Echols's testimony concerning the nature of the beating was also corroborated. In describing the beating, Echols testified that the men gathered around Caro and all used their closed fists to strike him. This is consistent with Dr. Blum's stipulated testimony that many of Caro's wounds were indicative of "the use of the knuckles to strike the victim" and that "force was applied to [Caro's] head for—from multiple directions." Echols testified that after Caro fell, the gang members began to stomp on him. To this point, Dr. Blum identified a "picket-fence pattern" and a

"chevron-type pattern" on Caro's face, which he found to be consistent with a "shoe or boot or something with a repeating pattern on it." Dr. Blum further testified that the "chevron-type pattern" was "caused more by stomping motion" rather than a kicking motion. Echols also testified that "a bat or a stick" was used to strike Caro. Based on Caro's wounds, Dr. Blum agreed that several of Caro's injuries were "consistent with being struck by a baseball bat." Finally, Echols described how Caro's shirt, shoes, and other personal belongings were removed after the beating. Indeed, Officer Fancsali, Officer Kubis, and Montemayor all testified that Caro only wore shorts and socks when they discovered his body. These details were mostly consistent with Lucio's testimony concerning the beating as well.[9]

¶ 52     In addition to Echols's recollection of the actual beating, other portions of his testimony concerning the identity of the involved parties and a potential motive were similarly corroborated. Echols identified himself, defendant, Lucio, Vargas, Hernandez, and Aguilar as all being members of the Latin Kings during 2005. Hahn confirmed these individuals' affiliation with the gang at that time. Echols also testified that "shorties" who have "shaken up" with full-fledged members are subject to "violations." Again, this information was confirmed by Hahn.

¶ 53     However, Echols's testimony was inconsistent at times. For instance, as defendant points out:

> "Echols was not consistent on the origins of his gang membership. He testified that he was introduced to gang membership through family but acknowledged during cross-examination that he previously testified at Vargas' trial that he was introduced to gang membership through friends at school."

---

[9] Unlike Echols, Lucio never specifically testified that Caro was "stomped" on.

The court made no reference to this inconsistency in delivering its ruling. However, because the exact origins of Echols's gang membership—occurring two years prior to Caro's murder—were not relevant to any material issue in this case, any impeachment concerning the matter was purely collateral. *People v. Santos*, 211 Ill. 2d 395, 405 (2004). While any type of impeachment may typically be developed during cross-examination, cross-examiners may not impeach witnesses on collateral matters. *Collins*, 106 Ill. 2d at 269. Although the State failed to raise an objection to defendant's impeachment, it was nonetheless improper, and therefore it should be accorded no weight when determining Echols's credibility. See *Rokeby-Johnson v. Derek Bryant Insurance Brokers, Ltd.*, 230 Ill. App. 3d 308, 315 (1992) (holding that "[w]hen a matter is being heard at bench only competent evidence is considered").

¶ 54    Defendant also argues that Echols's inconsistent testimony concerning the hierarchy of the Latin Kings and defendant's ranking position rendered his testimony unbelievable. Specifically, defendant contends that "Echols testified that the leader of the Latin Kings street gang was called the 'Inca' and that [defendant] was the Inca in September 2005. But on cross examination[,] Echols testified that he was '[n]ot sure' if an Inca was the leader of the gang or not." We disagree with defendant's assessment of Echols's testimony. The exact responsibilities of the gang's "Inca" is another collateral matter to the material issues in this case. *Santos*, 211 Ill. 2d at 405. Therefore, any impeachment concerning the matter was improper and should not bear any weight in the court's credibility assessment. See *Derek Bryant Insurance Brokers, Ltd.*, 230 Ill. App. 3d at 315. While Echols did admit to previously testifying that Lucio was the gang's "Inca" (in contrast to his more recent assertions), the court was still well within its discretion to find Echols's testimony credible. As provided earlier, much of Echols's clear testimony concerning the hierarchy of the

Latin Kings, the rules concerning "violations," and the various members of the gang were corroborated by Hahn.

¶ 55     Defendant similarly argues that Echols's testimony concerning the use of a bat or stick-like object was inconsistent. Defendant points out that during the discharge hearing, Echols testified that Vargas used a bat or a similar weapon to beat Caro. However, he had not mentioned the existence of such a weapon when speaking to the detective at the Du Page County Youth Home and also denied seeing a bat while testifying at Vargas's earlier trial. We add that Echols's testimony also contradicted Lucio's version of events, in which defendant was the individual who struck Caro with the bat. In addressing this argument, we first point out—as defendant concedes—that during Echols's cross-examination at Vargas's trial, he did eventually concede to seeing a bat. While it is troubling that Echols's recollection of the weapon was inconsistent, Echols's most recent testimony on the subject was thoroughly corroborated. Echols and Lucio testified that a bat was used in Caro's murder. Dr. Blum noted that several of Caro's injuries suggested that he was struck with a bat or similar weapon. While Echols's and Lucio's accounts differed as to who used the bat, both men commonly recalled that Vargas at least handled the bat at points of the beating. Furthermore, as Lucio testified that defendant struck Caro with the bat only after the group moved out of Echols's sight, it is logical that Echols did not observe defendant use the bat against Caro in order to testify to this fact.

¶ 56     Defendant also takes issue with the fact that Echols had previously lied to police when initially questioned about Caro's death on September 4, 2005. Citing *People v. Gutierrez*, defendant provides that lying to a police officer diminishes one's credibility. 387 Ill. App. 3d 1, 7 (2008). Defendant similarly points out that Echols's credibility was also reduced by virtue of his plea agreement, by his admitted drug use during the dates in question, and by the fact that his

testimony as an accomplice was already deserving of suspicion. Regardless, the sum weight of the evidence here does not compel us to overturn the court's assessment of Echols's credibility. Again, accomplice testimony is sufficient to sustain a conviction where the court had knowledge of the weaknesses of the accomplice's testimony and was nonetheless convinced of a defendant's guilt. *Tenney*, 347 Ill. App. 3d at 366; *Wollenberg*, 37 Ill. 2d at 484. Here, the court had knowledge of all of defendant's proffered concerns, and even cited most of these weaknesses in its oral ruling. Therefore, the court could rely on Echols's testimony in finding defendant "not not guilty." *Tenney*, 347 Ill. App. 3d at 366. Considering Echols's testimony in the light most favorable to the State, we find that any rational trier of fact could have found Echols's testimony sufficiently credible to establish that defendant was "not not guilty" of Caro's murder.

¶ 57                                B. Lucio's Testimony

¶ 58    We also find that a rational trier of fact could have found Lucio's testimony to be sufficiently credible to establish defendant's culpability. Much of Lucio's testimony concerning the location and nature of the beating mirrored that of Echols's. Both men testified that Caro's beating began on the sidewalk, which was confirmed by the patch of blood that Montemayor located when he first arrived on the scene. Like Echols, Lucio testified that Caro's body was moved to a neighboring yard after he was initially beaten. This testimony was corroborated by the collective testimonies of Officer Fancsali, Officer Kubis, and Montemayor. Echols's and Lucio's testimony regarding the identification of the involved parties was nearly identical. Both men testified that Echols and Aguilar acted as lookouts while Lucio, defendant, Hernandez, and Vargas all battered Caro. Both men testified that Lucio, defendant, Hernandez, and Vargas first used their hands and feet to beat Caro, before he was eventually struck with a bat-like weapon. Again, this testimony was consistent with Dr. Blum's descriptions of Caro's injuries. Finally, both men

testified that Caro's shirt and shoes were removed from Caro's body, as subsequently corroborated by the testimony of Officer Fancsali, Officer Kubis, and Montemayor.

¶ 59     Lucio's recitation of the Latin King's hierarchy and rules was completely corroborated by Officer Hahn's testimony. Additionally, Lucio's testimony concerning his, defendant's, and Hernandez's leadership positions within the gang were also corroborated by Hahn. Lucio testified that Caro claimed to be from "Thirty-Third," but that he personally doubted whether Caro was still an active Latin King. Hahn similarly testified that Caro was from the Latin King's Chicago chapters, "in the area of Thirty-Third and Morgan," but that he was not active in 2005.

¶ 60     However, similar to Echols's testimony, Lucio's testimony also exhibited certain weaknesses. As defendant points out, Lucio's testimony concerning the identity of the individual who first struck Caro varied. During Hernandez's and Aguilar's trial, Lucio testified that Hernandez first struck Caro. However, in the instant hearing, Lucio testified that defendant first struck Caro.

¶ 61     Certain portions of Lucio's testimony also conflicted with Echols's narration of events. While Echols had testified that he and Caro were at his mother's house prior to attending Ortiz's party, Lucio testified that Echols was with him, defendant, Hernandez, Aguilar, and Vargas at Jose Lozano's house earlier in the evening and that they arrived at Ortiz's house together. While Echols described Lucio's vehicle as being a van, Lucio specified that he had been driving his Lexus SUV on the evening of Caro's murder. As discussed above, Echols testified that Vargas had used a bat or similar weapon when striking Caro. On the other hand, Lucio recalled only defendant hitting Caro with a weapon. Lucio testified that Echols took Caro's cell phone after the beating—a fact that was never mentioned by Echols. Furthermore, the motive behind Caro's killing varied between Echols's and Lucio's testimonies. According to Echols, the men beat Caro as part of a violation to

redress Caro's unauthorized handshake with the full-fledged members of the Latin Kings. According to Lucio, the violation was in response to his belief that Caro had spread rumors about him while in jail.

¶ 62    Regardless, as the court noted, these points of contention were "less relevant, frankly, to the ultimate decision" as to defendant's culpability. Any questions concerning the group's whereabouts before Ortiz's party, the type of vehicle Lucio drove, the identity of Caro's first attacker, or the identity of the individual who struck Caro with a bat all bear little relevance in determining whether defendant participated in the beating. Furthermore, any disagreement concerning the motives behind the beating can be explained by Echols's and Lucio's differing viewpoints before the murder. Echols believed that the violation resulted from Caro "shaking up" with the full-fledged Latin Kings based on a conversation that he heard between Hernandez and defendant. Because Lucio did not take part in the conversation, his ignorance of this purported motive is understandable. Lucio even acknowledged that the other Latin Kings were already plotting before he met with them in Ortiz's bathroom. Furthermore, according to Lucio, Echols was not present when the gang discussed the rumors Caro allegedly spread while in jail. Therefore, Echols's ignorance of Lucio's purported motive is also plausible.

¶ 63    In addition to these inconsistencies, defendant argues that Lucio lacked credibility for other reasons. Namely, defendant argues that Lucio's credibility is irreparably diminished by his drug use during the dates in question, his prior convictions, the existence of his plea agreement, and the fact that he was an accomplice to Caro's murder. However, as we have already discussed, the court was fully aware of all of these weaknesses in issuing its decision. Therefore, because the trial court still found Lucio's testimony to be credible, his accomplice testimony was sufficient to establish defendant was "not not guilty" beyond a reasonable doubt. *Tenney*, 347 Ill. App. 3d at 366.

¶ 64    Defendant argues that *People v. Wilson*, 66 Ill. 2d 346 (1977) and *People v. Ash*, 102 Ill. 2d 485 (1984) warrant a different result. In both of these cases, our supreme court found that the accomplice testimony presented at trial was insufficient to sustain each of the defendants' convictions. *Wilson,* 66 Ill. 2d at 350; *Ash*, 102 Ill. 2d at 493. However, as the State points out, the accomplice testimony in both of these cases was undermined by the respective victims' inability to sufficiently identify each of the defendants. *Wilson,* 66 Ill. 2d at 350; *Ash*, 102 Ill. 2d at 494. Because the State's case here was not subject to such a grave deficiency, we find that these cases are distinguishable. For all of these reasons, viewing Echols's and Lucio's corroborated testimonies in a light most favorable to the prosecution, we find that a rational trier of fact could have found defendant "not not guilty" of Caro's murder.

¶ 65                          C. Lack of Direct, Physical Evidence

¶ 66    Finally, defendant suggests that because there was "no physical evidence linking [defendant] to the beating of Caro," "no reasonable evidence established [defendant's] guilt beyond a reasonable doubt." However, we disagree. "The lack of physical evidence in a case does not raise a reasonable doubt where an eyewitness has positively identified the defendant as the perpetrator of the crime." *People v. Reed*, 396 Ill. App. 3d 636, 649 (2009). Here, because Echols and Lucio both credibly identified defendant as having taken part in Caro's killing, the lack of physical evidence specifically linking defendant to the crime does not raise a reasonable doubt of defendant's culpability. See *Reed*, 396 Ill. App. 3d at 649.

¶ 67                                    III. CONCLUSION

¶ 68    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 69    Affirmed.